**Shyamala RAJENDER, on behalf of herself and a class of academic non-student employees and applicants at the University of Minnesota, Plaintiff,**

v.

**The UNIVERSITY OF MINNESOTA and the Regents of the University of Minnesota, Defendants.**

Civ. 4–73–435.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 16, 1983.

---

Paul Sprenger, Sprenger Olson & Shutes, Minneapolis, Minn., for plaintiff class.

Steven Dunham, Minneapolis, Minn., for defendants.

## ORDER

MILES W. LORD, Chief Judge.

Before this court is the Recommended Order for Amendment of the Consent Decree filed by the special masters in the above-entitled action. The recommended order was issued after a hearing at which the following persons appeared in support of the masters' February 1, 1982, Order to Show Cause: Paul C. Sprenger of Sprenger, Olson & Shutes, P.A., attorney for the class; Carolyn Chalmers and Kathleen Graham of Dayton, Herman, Graham & Getts; Dolores C. Orey of Kampf & Orey, P.A.,: Mark P. Wine of Oppenheimer, Wolff, Foster, Shepard & Donnelly; Gary A. Weissman of French & Weissman, P.A.; Laura Cooper of the Equal Employment Opportunity for Women Committee; representatives of the Faculty Advisory Committee for Women; and several members of the plaintiff class. Appearing in opposition to portions of the masters' Order to Show Cause were Peter S. Hendrixson of Dorsey & Whitney and Charles C. Mays of Leonard, Street and Deinard. Subsequent to the filing of the Masters' Recommended Order for Amendment of the Consent Decree, objections were filed by both claimants and the University, pursuant to Rule 53(e)(2), Fed.R. Civ.P.

On September 2, 1982, a hearing was held before this court. At that time, arguments of counsel were presented on the specific issue of the masters' recommended removal of the $6,000 limitation on partial attorneys' fees. Following the September 1982 hearing, additional fee information was requested of the University. The University complied with the court's request over a period of months, with the final affidavit submitted on December 2, 1982. The matter was then taken under advisement.

Having considered the objections of counsel, together with the Recommended Order and Memorandum of the Special Masters, this court adopts the recommendations in part and modifies in part.

## FACTS

This dispute derives from a class action originally brought by Dr. Shyamala Rajender against the University of Minnesota. The plaintiff filed her complaint on September 5, 1973, and her Second Amended Complaint on September 6, 1975, alleging that the defendants were engaged in employment discrimination based upon sex and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, and 42 U.S.C. §§ 1981 and 1983.

On February 13, 1978, pursuant to a motion for class determination, the court entered an order establishing that the action be maintained as a class action on behalf of:

all women academic non-student employees who have been employed by the University of Minnesota at any time after March 24, 1972, women who have applied for but were denied employment by the University in such positions after that date or women who would have applied

for such positions but for the discriminatory policies and practices of the University; all present women academic non-student employees; and all women who may in the future be employed in academic non-student positions or may in the future apply for but be denied such employment.

On April 24, 1978, the Court commenced a pilot trial of the Rajender claims and the sex-based claims of a subclass consisting of that portion of the class in the University's Chemistry Department on the Twin Cities campus. At the end of May 1978, the trial was recessed to enable the parties to explore the possibility of settlement. Following several rounds of extensive negotiations between plaintiffs' attorney Paul Sprenger and defendants' attorney Charles Mays, the parties began in January of 1980 a third round of settlement discussions which eventually produced the Consent Decree approved by this court on August 13, 1980. Portions of that Decree are the subject of the present Order.

## DISCUSSION

The focal point of the present controversy is that section of the Decree which limits a prevailing plaintiff's recovery of attorneys' fees to "... a reasonable sum, not exceeding Six Thousand Dollars ($6,000), for partial attorneys' fees which she incurred because of the proceedings." Consent Decree, Section II, Paragraph 9 (August 1980). The Recommended Order filed by the special masters would have this court delete that portion of Section II, Paragraph 9 which reads, "... not exceeding Six Thousand Dollars ($6,000)," thereby lifting the previously imposed ceiling but retaining the qualifications that the fee recovery be "partial." Recommended Order · for Amendment of Consent Decree, p. 2 (March 31, 1982). The defendants object to the masters' recommended amendment on a number of grounds, primarily the following:

1) the fee limitation was a bargained for material part of the Consent Decree; and

2) circumstances since the approval of the Decree, as reflected in the evidence presented at the show cause hearing, have not changed so drastically that the $6,000 limit on partial attorneys' fees is a source of grievous harm to the *Rajender* claimants. Responsive Memorandum of University of Minnesota in Opposition to Modification of Attorneys' Fee Provision in Consent Decree (March 8, 1983).

In addition to the foregoing, the defendants also object to the recommended changes by challenging the authority of the special masters to initiate the modification procedure. Because that challenge raises a threshold issue, this court will address the matter at this stage of the Order.

To resolve the problem, this court must look to two documents, the Consent Decree itself and the September 10, 1979, Order of Reference appointing the special master. The language of the Order of Reference provides that,

the powers and duties of the Special Master shall be those of the Court in resolving the issues herein, including the power to regulate all proceedings in every hearing before him and to do all acts and take all measures necessary or proper for the efficient performance of his duties under this order.

Order of Reference, paragraph 3 (September 10, 1979). Although that Order was entered prior to the final approval of the Consent Decree, it remains in effect as to those portions not specifically altered by subsequent decree.

The Consent Decree speaks only to the powers of the special master relating to the hearing and resolving of claims. Although not specifically enumerated in the Decree, the duties of the master to date have included the conducting of motion practice, the holding of elections, and the granting of exemptions to parties proceeding under the Decree. Both the University and the class have availed themselves of these extra-Decree powers and rightly so. For reasons of judicial economy, the powers of the master must be sufficiently broad to permit facilitating the remedial design of the Consent Decree without seeking leave of the court

at every turn. As a practical matter, any powers of this court, unless otherwise limited by either the Order of Reference or the Consent Decree, shall be the powers of the masters in relation to the effectuation of the Decree. Therefore, based upon the empowering documents and the accepted practice of administering the Consent Decree, it is the opinion of this court that initiating the modification process was within the scope of the masters' authority.

The plaintiffs' sole objection to the masters' Recommended Order challenges the proposed change in the fee provision as follows:

> The recommendation that the Consent Decree be amended so that the Special Masters have discretion to provide only partial attorneys' fees using criteria set out in the Memorandum is objected to as being ambiguous and permitting an interpretation contrary to Title VII, and further renders the Consent Decree inequitable, given the defendants' failure to comply with the Decree's provisions governing resolution of claims by internal processes."

Objections of Kathleen M. Graham (April 12, 1982). In order to resolve the instant controversy, this court must first consider the nature of a consent decree.

■ This court begins its examination of a consent decree by recognizing that the subject of the investigation is something of a hybrid in the law, having attributes of both contracts and judicial decrees. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1974). Because consent decrees represent the agreements on precise terms reached by parties after negotiation, the scope of a decree must be found within its "four corners." See *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). The Supreme Court stated in *ITT Continental Baking Co.* that, "since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract." *ITT Continen-*

*tal Baking Co.*, 420 U.S. at 238, 95 S.Ct. at 935. Such aids to construction would certainly include an examination of the circumstances surrounding the formation of the decree itself. See *Brown v. Neeb*, 644 F.2d 551 (6th Cir.1981); *ITT Continental Baking Co.*, 420 U.S. at 238, 95 S.Ct. at 935.

In the instant case, the *Rajender* Consent Decree embodies the bargained-for terms of the settlement of a Title VII action against the University of Minnesota by which each party relinquishes valuable rights in order to attain mutually acceptable benefits.

■ These contractual properties of a consent decree significantly define its scope. However, the terms of a decree are subject to an initial determination of reasonableness by the court and, in addition, the decree itself is subject to continued judicial supervision. Therefore, a consent decree also has attributes of a judicial act. The Court of Appeals for the Sixth Circuit, in an opinion affirming a district court's modification of a decree in a civil rights case, shed considerable light on this dual nature of a consent decree. *Stotts v. Memphis Fire Dept.*, 679 F.2d 541 (1982). Judge Keith, writing for the circuit court, stated that "[a]n approved consent decree is not simply a compact between former litigants, rather it is a court order. Consequently, a court has an affirmative duty to protect the integrity of its decree. This duty arises where the performance of one party threatens to frustrate the purpose of the decree." *Stotts*, 679 F.2d at 557. This positive mandate, which requires the court to serve as a guardian of rights embodied in a consent decree, also gives the court inherent authority to modify a decree should circumstances arise which thwart the decree's stated resolution.

The leading case on modification of a consent decree is *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). There, Justice Cardozo said:

> We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions, though it was entered by consent.... Power to modify the decree was reserved by its

very terms, and so from the beginning went hand in hand with its restraints. If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.

*United States v. Swift & Co.*, 286 U.S. at 114, 52 S.Ct. at 462.

■ The rule in *Swift* clearly establishes the court's right to modify a decree where there has been a change in the conditions which would make continued enforcement inequitable. However, a modification is not to be casually granted. The standard set down in *Swift* requires that "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *Swift* at 119, 52 S.Ct. at 464.

■ The issue before this court becomes, therefore, whether or not the requisite showing of wrong has been made in order to justify the recommended modification of the 1980 *Rajender* Consent Decree.

The stated purpose of the *Rajender* Decree was "to correct previous inequities, if any, and to achieve on behalf of women full representation with respect to faculty employment at the University of Minnesota." Consent Decree, p. 3 (1980). In order to achieve that goal, the parties to the Decree created certain procedural measures. One of the more significant of these measures, agreed to by the parties and approved by this court, was an internal/administrative process, whereby the special masters "shall defer action on any claim which has not been previously heard and determined by an appropriate University tribunal and shall refer such claim to the University, which may refer the matter to an appropriate internal academic tribunal." Consent Decree, Section II, D(1) (1980). As the masters ably stated in the memorandum accompanying their Recommended Order, the value to the University of such an internal process was the possibility of peer resolution within the University system before resort to judicial intervention. Both parties potentially would benefit by this extremely "cost-efficient method of finding facts" in which neither claimant nor defendant required counsel. Memorandum of Special Masters, p. 5 (March 31, 1982). In addition, it was anticipated that in the few cases that would be heard by the masters where counsel would be retained for trial, the issues left for resolution would have been narrowed considerably and any discovery would have largely been completed by the time the claimant contacted an attorney. The quid-pro-quo for the University's providing the internal grievance procedure and its streamlining effect was the approval by the class and the court of the ceiling on partial attorneys' fees for prevailing claimants.

It is obvious to this court that the basic problem with the Consent Decree at this point in time is the failure of that internal grievance procedure to function as originally planned. Regardless of whether the failure arose from defendants' neglect or from the unanticipated number of claims filed, an inequity has resulted that the masters' proposed modifications are intended to cure.

The defendants, however, object to the suggested change in the attorneys' fees limitation by stating that "the evidence presented at the hearing was insufficient, as a matter of fact and law, to justify the amendment proposed in paragraph 1(a) of the Recommended Order." Defendants' Objections to Recommended Order (April 12, 1982). Incorporated into its objections in an earlier memorandum, filed shortly after the show cause hearing, the University, in an apparent attempt to show that no "grievous wrong" has been suffered by plaintiffs, lauds the Consent Decree as "good" and "workable," including the attorneys' fee provision. Responsive Memorandum of University of Minnesota (March 8, 1982). The memorandum cites the number of claims already filed under the decree and the potential monetary benefits to the class as substantiation for its position. Responsive Memorandum at p. 4.

In theory, this court concurs wholeheartedly with the University's evaluation of the *Rajender* decree. Since its inception, the Consent Decree has served as a model for the resolution of other complex litigation involving similar issues. Numerous *Rajender* claimants have availed themselves of the special masters; and in many instances where the plaintiff has prevailed, considerable benefits have been realized. These benefits, inuring to the class following trial or settlement, have included promotion, tenure, back pay and salary increases, some of them substantial. However, the fact that the system has proved workable for some does not mean it has served equally well all for whom it was created to serve.

The affidavit of the law clerk to the special masters, filed in anticipation of the show cause order, expresses an understanding that a number of claimants are unable to secure representation because of the $6,000.00 fee limitation. Corroborating information in the form of affidavits submitted by attorneys for class members indicates that trial preparation for a *Rajender* claim can be very costly; and even if the claimant prevails, it is unreasonable to expect her to bear the cost of the litigation out of her annual salary or any award of back pay she may receive. At least one attorney stated in her affidavit that she will take no more *Rajender* cases under the present structure of the Consent Decree. A number of claimants testified at the show cause hearing, and were cross examined by the University, regarding their difficulties in finding an attorney to represent them. Several of the women commented that even if they found attorneys who were interested in their cases, the attorneys eventually declined to represent them because the $6,000 limitation on fees would not begin to compensate them adequately for the work required to prepare the cases for trial. An affidavit from the Deputy Executive Director of the MEA attests to the fact that the union is paying the legal fees of several claimants and that those fees far exceed $6,000 per claimant. However, other evidence indicates that only a small portion of the class is entitled to these legal services and, therefore, the effect of this support on the fee problem as a whole is insignificant.

This evidence clearly shows that claimants without the benefit of the internal procedure are now approaching attorneys with only the rudiments of their cases. Many of those attorneys with enough experience to understand the complexity and length of Title VII litigation refuse to take the cases because the partial fee limitation does not cover expenses or provide sufficient monetary incentive. Therefore, claimants are left to prosecute a claim without counsel in an area of the law which cries out for the attention of an expert. It is the opinion of this court that the present state of the Consent Decree procedures, unforeseen at the time the agreement was approved, grievously wrongs the members of the class and amounts to a frustration of the Decree's stated purpose.

Examination of the record of the show cause hearing evidences the fact that a possible solution to the attorney retention problem was considered by the masters. It was proposed at the hearing that a panel of attorneys be established so that potential claimants would have a pool of professionals, trained in the workings of the Consent Decree, to draw upon for representation of their respective claims. Hearing Transcript, Vol. I, p. 22 (February 16, 1982). While availability of knowledgeable attorneys would no doubt expedite the resolution of *Rajender* cases, it is the opinion of this court that utilizing the panel without curing the fee limitation problem would not provide an effective solution. Use of the panel represents a step in the right direction; however, comprehensive relief will not be accomplished without more.

The inequity in the present status of the Decree is further reflected by the disparity in amounts paid by the University to its own attorneys in defense of claims and the amounts available to prevailing class members for payment to their respective counsel. The affidavits and billing information submitted by the University pursuant to this Court's request indicate that as of November 24, 1982, the University had paid

$691,035.41 to its counsel for work on approximately 260 claims. Although the equivalent information is not available for the class, an example of a recently completed trial serves to illustrate the scope of the disparity. Drs. Schick and Plack, claimants under the Consent Decree, retained a Minneapolis attorney to represent them in their respective claims. The cases were consolidated for trial and heard by Special Master Edward Parker, who, after four weeks of trial, recommended that judgment be entered for the plaintiffs. If the recommended judgment stands on appeal, the maximum amount of money for attorney's fees available to each prevailing plaintiff is $6,000.00. An affidavit submitted by plaintiffs' counsel during the pendency of the trial estimated the cost of the litigation would be between $70,000 and $100,000. Affidavit of Kathleen M. Graham (September 2, 1982). The report on *Rajender* attorneys' fees prepared for this court by the University and submitted after the close of the Schick and Plack trial indicates the University has paid its own attorneys a total of $117,493.85 in defense of the Schick and Plack claims. This disparity in resources underlines the inequity in the very system designed to promote equality. As stated by the masters, "[t]o retain the $6,000.00 ceiling on fees for claimants, who now must compete in what is a normal complex litigation forum rather than a peer resolution, would transform an agreement fair when made into an 'instrument of wrong.'" (Citation omitted.) Memorandum of Special Masters (March 31, 1982).

It is the opinion of this court that the *Swift* standard for modification of a consent decree has been met. While the court concurs with the masters and adopts their reasoning and proposed changes for the majority of the modifications, it cannot concur with the masters' proposed retention of the concept of partial fees. In light of the failure of the internal grievance procedure to function as planned, reimbursement of full, reasonable attorneys' fees to prevailing plaintiffs seems essential to assure just resolution of the claims filed under the Decree. Anything less would be ambiguous, inequitable and confusing to administer.

Therefore, based upon the recommendations of the masters and an independent review of the files, record, and proceedings, IT IS HEREBY ORDERED That Section II, Paragraph 9, of the Consent Decree is amended as to the first sentence of the second paragraph thereof to read as follows:

In any Claim Proceedings hereunder before a Hearing Panel in which a Claimant finally prevails, she shall receive, in addition to any backpay or other relief to which she may be entitled, her reasonable costs and disbursements which would be recoverable in a Title VII action and a reasonable sum for attorneys' fees which she incurred because of the proceedings.

There shall be no retroactive effect to this portion of the Order except where provided for by previous agreement of the parties.

Because this court has reviewed the masters' remaining recommendations and concurs with the proposed changes and because no specific objections were filed regarding those proposed changes, IT IS HEREBY FURTHER ORDERED That the Consent Decree is modified as follows:

1) That section II, Paragraph 7, shall be amended to delete the third sentence of the third paragraph and substitute therefor the following language:

No transcript of trial proceedings hereunder shall be prepared and filed unless specifically requested by a party to the action; and where a transcript is required, attorneys for both parties shall confer and stipulate to those sections of the transcript deemed necessary. The cost of preparing any such written transcript or portion thereof shall be a cost of the Special Master(s);

2) That Exhibit B, Paragraph 4(1), is amended to delete the reference to *The New York Times;*

3) That all settlements of claims between claimants and defendants shall be submitted to the Special Masters for ministerial review. All such agreements shall in-

clude the substantive terms of the agreement and a specification of remedies agreed upon. Following said ministerial review, the special masters shall file the signed stipulation of dismissal of the parties with the Clerk of District Court.

4) That the Hennepin County Bar Association Lawyer Referral and Information Service is authorized to create a panel of attorneys and to assist in locating competent counsel for members of the class with claims herein. That any panel created be composed of lawyers familiar with the procedures under the Consent Decree and agreeable to the policies and practices of the Lawyers' Referral Service. That membership by an attorney on said panel is voluntary and not a requirement of undertaking representation of *Rajender* class claimants.