Shyamala RAJENDER, on behalf of herself and a class of academic non-student employees and applicants at the University of Minnesota, Appellee,

v.

The UNIVERSITY OF MINNESOTA and the Regents of the University of Minnesota, Appellants.

Shyamala RAJENDER, on behalf of herself and a class of academic non-student employees and applicants at the University of Minnesota, Janet Macey, Yolande Jenny, and Mary Strother (Class Members & Individual Claimants), Appellants,

v.

The UNIVERSITY OF MINNESOTA and the Regents of the University of Minnesota, Appellees.

Nos. 83–1371, 83–1425.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1983.

Decided March 26, 1984.

---

See also 546 F.Supp. 158.

Dorsey & Whitney, Peter S. Hendrixson, Michael J. Wahoske, Stephen S. Dunham, Gen. Counsel, University of Minn., Minneapolis, Minn., for University of Minnesota, et al.

Paul C. Sprenger, Eric L. Olson, Robert L. Shutes, Sprenger, Olson & Shutes, P.A., Minneapolis, Minn., for appellees.

Before ARNOLD and FAGG, Circuit Judges, and NICHOL,* Senior District Judge.

ARNOLD, Circuit Judge.

After 11 weeks of trial and intense negotiation, a class action charging discrimination on the basis of sex by the University of Minnesota against academic non-student employees was settled. *Shyamala Rajender v. University of Minnesota*, Civil No. 4–73–435 (D.Minn. Aug. 13, 1980) (consent decree filed). The consent decree provided, among other things, for a $6,000 limit on attorneys' fees that the University would have to pay for class members who suc-

---

* The Hon. Fred J. Nichol, Senior United States District Judge for the District of South Dakota, sitting by designation.

cessfully proved a claim. Later, the District Court modified the decree, over the University's objection, by removing the limit on fees, so that the University would be liable for reasonable attorneys' fees with no dollar limitation, in cases where class members prevail. Because the evidence supporting this change does not amount to "hardship and oppression, extreme and unexpected," as required by our leading case on the subject, *Humble Oil & Ref. Co. v. American Oil Co.*, 405 F.2d 803, 813 (8th Cir.) (Blackmun, J.) *cert. denied*, 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969), we reverse.

## I.

Dr. Shyamala Rajender filed suit in September, 1973, against the University alleging that it had discriminated against women in employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1976), as amended, and 42 U.S.C. §§ 1981 and 1983 (1976). In 1975, she amended the complaint to include class-action allegations. The District Court certified a class in 1978.[1] The case went to trial; after weeks of trial and much negotiation, a consent decree was approved. The University did not admit to any wrongdoing or violation of any law.[2]

The decree is detailed and comprehensive and confers substantial benefits on the plaintiff class. It allows the assertion of some claims—based on acts of discrimina-

tion going all the way back to 1972, when Title VII became applicable to state and local government—that would otherwise be barred by limitations, even given the normal tolling effect of class actions. It requires the University to favor women over men in cases of equal qualifications in some circumstances. It increases somewhat the normal burden of proof on Title VII defendants. In the case of the Chemistry Department, it reverses the customary burdens and requires the University, once a claimant has made a prima facie case, to persuade the trier of fact that it had a legitimate, nondiscriminatory reason for the action complained of. ¶ II.D.8 (D.R. 23). It requires the University to fund a Faculty Advisory Committee for Women to assist claimants. And it establishes a special procedure for the filing and consideration of claims of class members, including claims arising in the future.

As part of this procedure, the decree provides for the appointment by the District Court of three Special Masters. (Three distinguished Minnesota lawyers have been appointed.) A member of the class who wishes to assert a claim files it with the Special Masters. They defer action on the claim for 180 days, not including the period between June 16 and September 15 of any given year. Claims are referred to the University during this deferral period, and it *"may* refer the matter to an appropriate internal academic tribu-

1. The class is defined as:
   all women academic non-student employees who have been employed by the University of Minnesota at any time after March 24, 1972, women who have applied for but were denied employment by the University in such positions after that date or women who would have applied for such positions but for the discriminatory policies and practices of the University; all present women academic non-student employees; and all women who may in the future be employed in academic non-student positions or may in the future apply for but be denied such employment.

2. The introduction to the decree states:
   This Decree, being issued with the consent of the parties following eleven weeks of trial, shall not constitute an adjudication or finding on the merits of the case, and shall in no

manner be construed as an admission by the Defendants or a finding by the Court of any violation of Title VII or of any Civil Rights Laws or of any other wrongful conduct or practices on the part of Defendants or either of them. Rather, it is the intention of the University, in light of its stated policy of promoting equal opportunity in employment, to implement this policy in the most effective and just manner possible and to divert the resources which would otherwise be spent in further contested litigation to this end. It is the intent of the parties to resolve by this Decree all issues raised by the Second Amended Complaint, to correct previous inequities, if any, and to achieve on behalf of women full representation with respect to faculty employment at the University of Minnesota.
Designated Record (D.R.) 10–11.

nal ... for the sole purpose of permitting a final, fully informed, internal judgment by the University." ¶ II.D.1 (D.R. 17) (emphasis ours). If the University does not complete its internal consideration within the prescribed deferral period, "it shall be deemed to have waived further internal consideration of such claim." ¶ II.D.1 (D.R. 19). And if the Special Masters determine "that the University is not making a good faith effort to refer [a] matter to an appropriate internal tribunal ..., the Special Master[s] may shorten the deferral period ...." ¶ II.D.5 (D.R. 21). Any conclusion reached by an internal tribunal is subject to final approval by the President of the University.

Cases not resolved to the satisfaction of both sides by this internal process go before a Hearing Panel, composed of a Special Master and two other members, one appointed by the claimant and one by the University. Conclusions of hearing panels are reviewable by the District Court, see Fed.R.Civ.P. 53(e)(2), and thereafter on appeal by this Court. "In any Claim Proceeding hereunder before a Hearing Panel in which a Claimant finally prevails," the University must pay all the reasonable costs and expenses, as in ordinary Title VII litigation, plus an amount not to exceed $6,000 as a partial attorneys' fee. ¶ II.D.9 (D.R. 23). The University gives up its Title VII right to seek an award of fees and expenses against vexatious or frivolous claimants.

This $6,000 limitation was the subject of hard bargaining on both sides. The University at one time or another during the negotiations proposed that costs and expenses come out of whatever limit was agreed to, that the use of any "multiplier" in the computation of fees be expressly forbidden, and that the limit be fixed at some lower level, say $750 or $3,000. The plaintiff class variously proposed that there be no limit, that there be an exception for extraordinarily complex or protracted cases, and that an allowance be made for future inflation. All of these positions, on both sides, were ultimately surrendered in favor of the language appearing in the consent decree. No objections to this portion of the decree were voiced at the fairness hearing held by the District Court.

The decree also contains two other provisions at issue on this appeal. It requires the University to advertise faculty positions in *The New York Times* and to pay for transcripts of proceedings on each individual claim.

On February 4, 1982, about nine months after they had approved the details of an internal-review process for the University to use for consideration of individual claims, the Special Masters issued to all parties an order to show cause why the decree should not be modified in certain respects. The modifications proposed for consideration included the three areas argued in the case at bar: the $6,000 fee limitation, *The New York Times* advertisement requirement, and the purchase of transcripts.

A hearing was held before the Special Masters. Most of the argument was about fees. Two themes ran through the claimants' case on this subject: that the internal procedure for resolution of claims was not being used, and that claimants had been unable to obtain counsel because of the attorneys' fees limitation. The claimants contended that because the internal procedure for resolution of claims was not being used, they had to engage counsel in order to have their claims resolved, and that the fee limitation made counsel difficult to employ. The University argued in response, *inter alia*, that there is no legal limit on the amount of her own money a claimant can spend; the limitation is that the University is obliged to pay only a portion of the fees, up to $6,000, to claimants who succeed. As a result of the hearing, the Special Masters issued a Recommended Order for Amendment of the Consent Decree in the areas addressed. Specifically, the Special Masters recommended elimination of *The New York Times* advertising and transcript-purchase requirements. As to fees, they recommended elimination of the dollar limit; but the decree would continue

to provide only for partial fees: the Hearing Panels would decide, in each case of a prevailing claimant, what portion of her fees the University should in fairness pay.

The District Court conducted a hearing on the Special Masters' recommendations. The Court believed that the internal-review procedure was what the University gave in exchange for the claimants' agreeing to limit recovery of attorneys' fees to $6,000. The Court thought that the basic problem with the consent decree was the failure of the internal grievance procedure to function as originally planned. It stated: "the present state of the consent decree procedures, unforeseen at the time the agreement was approved, grievously wrongs the members of the class and amounts to a frustration of the Decree's stated purpose." *Shyamala Rajender v. University of Minnesota,* No. 4–73–435, slip op. at 10 (D.Minn. Feb. 16, 1983). 563 F.Supp. 401. The Court then issued an order adopting, in part, the recommendations of the Special Masters. It struck *The New York Times* advertising requirement and the mandatory transcript preparation for every case. As to fees, the Court agreed with the Special Masters that the $6,000 limit should be removed. But it went beyond the Masters' recommendations in one respect: it also struck the reference to "partial" fees. Under the decree as now amended by the District Court, therefore, successful claimants would receive all of their reasonable fees and expenses as part of the relief against the University.[3]

The University appeals the removal of the fee limitation, contending that it was a negotiated, material part of the consent decree, and that any change in circumstances was not so drastic as to cause grievous harm to the *Rajender* claimants. Several individual class members appeal the deletion of the requirements that the

University advertise in *The New York Times* and that the University automatically buy transcripts. They appeal in the alternative; that is, they would withdraw their objections to the advertising and transcript deletions if the attorneys' fees cap is lifted. But if the Court keeps the attorneys' fees limitation, for whatever reason, they ask that *The New York Times* advertising and the transcript-preparation requirement also be preserved.

## II.

Both the District Court and the Special Masters, in considering whether the proof justified modification of the consent decree, applied the standard laid down by Justice Cardozo in *United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 462–63, 76 L.Ed. 999 (1932). There, the Supreme Court declared that a court has the power to revoke or modify a consent decree "if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." The Court went on to note that this power is strictly limited:

> We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting.... Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

*Id.* at 119, 52 S.Ct. at 464. Plaintiffs, although arguing that the change in the attorneys' fee arrangement made below meets this standard, first suggest that the

---

3. The District Court remarked, speaking of the original decree, slip op. at 10, that "the partial fee limitation does not cover expenses." In context, this statement seems to mean that the District Court thought that costs and expenses, like fees, would have to come out of the $6,000, or else be paid by the claimant herself. We do not

so read the decree. We think it clear that prevailing claimants are to be paid in full their reasonable costs and expenses, and not just court costs proper in the narrow, traditional sense, but all expenses customarily awarded under 42 U.S.C. § 2000e–5(k). The $6,000 limitation applies only to fees as such.

standard applied by the Special Masters and the District Court was in fact too strict, and that when change is sought by plaintiffs, as opposed to defendants, as was the case in *Swift*, consent decrees may be changed if for any reason they are not achieving their purpose. The purpose of this decree, it is said, was to eliminate the discrimination and injustice that had existed in the past at the University. This purpose is frustrated, claimants argue, by the lack of internal review proceedings and the difficulty in obtaining counsel occasioned by the fee limitation.

■ We think the Special Masters and the District Court applied the correct standard. Claimants' argument is inconsistent with what appear to us to be the better reasoned cases. Claimants' chief reliance is on *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), in which the Supreme Court, reversing the District Court, directed that a decree be modified because it was not achieving its purpose. The modification was sought by the plaintiff, the United States. There is language in the *United Shoe* opinion which, when read in isolation, seems to say, as claimants argue, that a different standard is to be applied to decree modifications sought by plaintiffs, a standard easier to meet than the rule of *Swift*, applicable to modifications sought by defendants. When the entire *United Shoe* opinion is read and considered in context, however, it is clear that the Court was strongly *influenced* by the fact that the defendant was a proven wrongdoer. The decree was based on a finding that the defendant had violated Section 2 of the Sherman Act. Judge Aldisert, speaking for the Third Circuit in *Fox v. United States Department of Housing & Urban Development*, 680 F.2d 315, 323 (3d Cir. 1982), makes the very point we have in mind:

> The only instance in which the Supreme Court has endorsed imposition of new and substantial burdens on a defendant party to a consent decree, *United States v. United Shoe Machinery Co.*, 391 U.S. 244 [88 S.Ct. 1496, 20 L.Ed.2d 562] (1968), ..., is clearly inapposite. In *United Shoe Machinery*, there was an explicit prior adjudication that the defendant had monopolized the relevant market in violation of Section 2 of the Sherman Act. In this context the Supreme Court required the district court to modify the decree to assure complete extirpation of the illegal monopoly. "Its duty is implicit in the findings of violation of § 2 and in the decisions of this court as to the type of remedy which must be prescribed." *Id.* at 251 [88 S.Ct. at 1501].

We agree with the Third Circuit that *United Shoe* does not change the *Swift* standard in cases where the defendant has not been adjudicated a wrongdoer. As we have explained above in describing the terms of the consent decree, this is such a case. The decree does not find the University guilty of anything.

■ Nor should there be, on principle, any distinction made between plaintiffs who seek changes in consent decrees and defendants. As the Supreme Court explained in *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) (footnote omitted):

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four cor-

ners, and not by reference to what might satisfy the purposes of one of the parties to it.

The question, then, is whether claimants are suffering hardships so extreme and unexpected as to justify regarding them as victims of oppression, and whether there has been a clear showing of grievous wrong evoked by new and unforeseen conditions. As Judge, now Justice, Blackmun explained, interpreting the *Swift* standard for this Court:

> modification is only cautiously to be granted; ... some change is not enough; ... hardship and oppression, extreme and unexpected, [must be] ... significant; and ... the movants' task is to provide close to an unanswerable case.[4]

*Humble Oil & Ref. Co. v. American Oil Co., supra,* 405 F.2d at 813. With this standard in mind, we turn to the parties' contentions and the District Court's analysis, mindful that "our role requires dispassionate and neutral application of settled legal precepts governing consent decrees." *Fox v. HUD, supra,* 680 F.2d at 319. We review the District Court under an abuse-of-discretion standard. See, *e.g., System Federation v. Wright,* 364 U.S. 642, 648, 81 S.Ct. 368, 371–72, 5 L.Ed.2d 349 (1961).

### III.

We have carefully examined all of the transcripts of the proceedings before the Special Masters and the District Court, as well as the exhibits submitted on both sides. The University argues that much of the evidence offered by claimants was hearsay, allowed over the University's objection, but we assume for purposes of this appeal that the Special Masters and the

District Court properly considered all of the evidence before them. A great deal of it, probably most of it, is to the effect that the $6,000 limitation on fees makes it difficult to attract competent counsel, and that the University is able to spend and is spending more money for lawyers per case than claimants. The District Court was impressed by this showing, and indeed it has equitable appeal, at least as an original matter. These considerations, had they been brought to the District Court's attention by objections at the time of the original fairness hearing, would certainly have been relevant.

■ To give them substantial weight now, however, would violate the command of *Swift* "not [to] subject [the decree] to impeachment in its application to the conditions that existed at its making." 286 U.S. at 114, 52 S.Ct. at 462. It was just as true in August of 1980, when the decree was originally proposed, as it was in February 1982, when the Special Masters initiated the modification proceeding, that competent counsel are hard to attract in Title VII cases, especially when fees are limited, and that the University of Minnesota, backed by the State, has more money to pay lawyers than individual claimants do. The attorneys representing the class who participated in the negotiations leading up to the consent decree presumably were knowledgeable of Title VII litigation and aware of its cost. They must have known the approximate number of hours $6,000 would buy. They must have known that the uncertainties of Title VII litigation often make counsel difficult to obtain even in the absence of a dollar limitation on fees allow-

---

4. Several circuits, likewise, adhere closely to *Swift.* See, e.g., *Fox v. United States Dept. of Housing and Urban Development,* 680 F.2d 315 (3d Cir.1982); *United States v. Chicago,* 663 F.2d 1354, 1360 (7th Cir.1981); *Roberts v. St. Regis Paper Co.,* 653 F.2d 166, 174 (5th Cir. Unit B 1981); *Holiday Inns, Inc. v. Holiday Inn,* 645 F.2d 239, 240 (4th Cir.), *cert. denied,* 454 U.S. 1053, 102 S.Ct. 597, 70 L.Ed.2d 588 (1981); *Equal Employment Opportunity Commission v. Safeway Stores, Inc.,* 611 F.2d 795, 799 (10th Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980). *But cf. New York*

*State Association for Retarded Children v. Carey,* 706 F.2d 956, 969–71 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983) (seemingly easier standard for modification applied in altering bed limitation for facility for mentally retarded because of need for flexibility in determining conditions of institutional care and intervening change in the law). For an interesting discourse in favor of a more relaxed standard for modification of consent decrees see *Holiday Inns, Inc.,* 645 F.2d at 242 (Phillips, J., dissenting).

able to prevailing parties. Nevertheless they bargained for the "cap" in the consent decree.

We cannot save the parties from a bad bargain, or from a bargain that they now claim was bad. *In re Endeco*, 718 F.2d 879 (8th Cir.1983), citing *United States Fid. & Guar. Co. v. Barber*, 70 F.2d 220, 226 (6th Cir.1934). One of class counsel acknowledged the point at the oral argument before the District Court:

> it would be a mistake to premise the Masters' findings ... on the fact that some of these cases cost more than $6,000 to try.
>
> That's true, but I think that that reasoning is always there in any type of Title 7 case.

Tr. of District Court proceedings (D.C.Tr.) 55. In short, difficulties in obtaining counsel are not the kind of unforeseen hardship necessary to modify this decree under the mandate of *Swift* and *Humble Oil.*

In addition, the difficulties in obtaining counsel seem overstated. According to the affidavit of Stephen S. Dunham, General Counsel of the University of Minnesota, submitted to the District Court, only 12 individual claimants whose claims had by that time been returned to the Special Masters were not then represented by counsel. D.R. 250. The figures contained in the affidavit do not seem to be disputed. They put to one side a number of claims that fall into groups. There was, for example, a group of 50 nurses represented by one lawyer. These claims apparently have many facts in common. They can be litigated much more economically than 50 claims brought by individuals in unrelated parts of the University. If all of the nurses prevail, a total of $300,000 (50 times $6,000) would be available for lawyers' fees. The nurses' counsel told the District Court, D.C. Tr. 9, that "we can do the work for that."

Furthermore, claimants who have current grievances, arising within the normal Title VII limitations period, have the choice of filing an ordinary suit instead of using the claims procedure established by the consent decree. Yet, several "new" claimants have chosen the decree process, notwithstanding their ability to escape the fee limitation by filing directly in the District Court.

Plaintiffs argue that the University's failure to use internal tribunals to resolve claims short of litigation supplies the necessary significant change in conditions. It is said, and it seems to be true, that of the 277 individual claims filed as of the time of the hearing before the District Court, only two had been referred to internal tribunals established by the University under the consent decree. If more claims had been referred to this process, the argument goes, more would have been resolved without the necessity of going before a hearing panel or to court, and lawyers would have been needed in fewer cases. Mark Wine, an attorney for several claimants, testified that "[w]hat started out as kind of a cooperative attempt at resolving claims has turned into pretty much ordinary civil litigation." Tr. of proceedings before the Special Masters (S.M. Tr.) 53. Kathleen Graham, counsel for other claimants, testified that "nothing is being resolved internally without an attorney." S.M. Tr. 67. Several claimants testified to the University's lack of cooperation with respect to the internal procedure; one claimant said that the University had been hostile even to attempts by claimants to use the procedure. *Id.* at 119. Claimants also point to difficulties in getting documents from the University in advance of litigation. *Id.* at 139.

These points cannot withstand analysis. One big difficulty with this line of argument is that the internal-review process, under the terms of the consent decree, is entirely permissive. The decree says only that the University "may" implement an internal-review procedure. Failure to use the procedure is not a violation of the decree, and claimants, by their failure to move the District Court simply to force the University to comply with the decree in this respect, seem to concede as much. Claimants agree that the decree does not require

the University to refer any particular claim to the internal-review process. They insist, however, that the process was intended to be an important part of the decree mechanism, and that everyone expected the University to use it in a substantial number of cases. If this is true, the decree itself provides a remedy for the failure of the University to make a good-faith effort to refer a matter to an appropriate internal tribunal, or otherwise comply with the provision concerning individual claims. In such cases, the Special Masters, after making appropriate findings, may shorten the deferral period. The whole internal-review process, moreover, seems to have been instituted, so far as the language of the decree indicates, for the University's benefit, not for the benefit of claimants. It gives the University a chance to resolve claims short of litigation and provides that it will lose the benefit of the deferral period if it fails to use the process for that purpose.

The proof shows at most that the internal-review process has been used considerably less than counsel for the class expected.[5] We do not find this disappointment a sufficiently serious unforeseen circumstance to justify modification of the decree. The difficulty that claimants have experienced in obtaining counsel has not been clearly tied in any logical fashion to the absence of internal-review proceedings. No doubt it is true that claims settled in advance of litigation before the Special Masters or in court will involve smaller fees, but many claims have been settled short of litigation without going through any formal intra-university judicial process. And the individual claim that, up to the time of the hearing in the District Court, had produced the most protracted trial in court had itself been through 25 days of internal hearings.

Furthermore, even if internal tribunals had been more widely used, it is pure speculation to say that more claims would have been "resolved," in the sense of being settled in a way satisfactory to claimants, so as to remove their need to go to court. For the results of any internal process undertaken pursuant to the decree were always, by the very terms of that instrument, subject to final approval or disapproval by the President of the University. If, as claimants say, the University has been taking an adversary, as opposed to a collegial, position in dealing with claimants, it seems that no more claims would have been settled to claimants' satisfaction even if the internal-review process had been used more often. No doubt it remains true that plaintiffs are disappointed, and perhaps properly so in a moral sense, by the University's adversary posture. But this kind of disappointed expectation does not justify changing a meticulously negotiated consent decree. Claimants and the University have been adversaries in this case for quite a long time. It was not realistic to expect the consent decree to change this situation, at least so far as individual claims of past wrongdoing are concerned.

In sum, we conclude that the evidence in this record falls short of the exacting showing required by *Swift* and *Humble Oil*. When judged against the requirements of those cases, the District Court's order was an abuse of discretion. The removal of the $6,000 limitation on attorneys' fees must be reversed.

### IV.

It remains to discuss the other respects in which the District Court modified the decree: the elimination of the requirements that positions be advertised in *The New York Times* and that the University pay for transcripts of proceedings on each indi-

---

5. It probably also has been used less than counsel for the University expected at the time the decree was originally entered. There is some indication that the University has not used internal tribunals because more claims have been filed than anyone expected, and the internal tribunals simply do not have time to handle this volume within the 180 days specified in the decree as the deferral period. Class counsel do not claim that they were misled by the University on this score. "[I]t is perhaps going too far to say I was misled, because the Consent Decree does say that they *may* implement internal proceedings." S.M. Tr. 203 (emphasis supplied).

vidual claim as a matter of course. The Special Masters found that not one woman had been hired as a result of the advertisements in *The Times*, and that the right of any claimant to obtain, at University expense, a transcript of the proceedings on her own individual claim was sufficient to carry out the purposes of the decree. Both these requirements, the Masters found, "will cause burdensome and unproductive expense to the defendants unless amended." D.R. 126.

The appellee class asks that all three changes in the decree be affirmed as a package. It does not specifically attack the advertising and transcript changes. The three class members who have cross-appealed do argue that these two changes fail to meet the *Swift* standard. They ask us to reverse the Special Masters in these respects unless the removal of the fee limitation is affirmed. The University replies that the three individual cross-appellants have no standing to assert this argument. Each of them has settled her individual claim. The settlement agreements provide for a reopening of the cases, if the attorneys' fee limitation is ultimately removed, in order to permit the claimants to seek additional fees. But, the University argues, these individuals have no stake at all in the advertising and transcript features of the decree.[6]

We find it unnecessary to decide whether cross-appellants have standing. Under 28 U.S.C. § 2106, we have power to affirm, reverse, modify, or remand for whatever proceedings may be just. Even if the cross-appeal should fail for lack of standing, the advertising and transcript issues would still be before us, for they are, or may be, closely bound up with the fee issue presented by the main appeal. The class presented an exhibit (PX 2) to the Special Masters purporting to show that elimina-

tion of *The Times* and transcript requirements would save more than enough money to pay whatever additional fees might be due because of the deletion of the $6,000 limit. We do not know if either the Special Masters or the District Court believed this exhibit: neither of the opinions below mentions it. But the Special Masters did say, D.R. 125, that the "large sum of money" required to advertise in *The Times* "is better spent by defendants in other ways to achieve full representation of women in faculty positions."

■ This language persuades us that the Special Masters may have altered the advertising portion of the decree, and perhaps the transcript provision as well, in part in order to free funds for payment of additional fees. We have disapproved the removal of the fee limitation. We do not know whether the Special Masters or the District Court would have approved the advertising and transcript changes, had they not been presented with the fee issue as well, or had they known that the change in the fee provision would ultimately fall. There is more than a negligible possibility that all of these changes were, as a practical matter, considered and approved as a group, each part of which depends on the whole. The best and fairest course is to give the District Court a chance to address the advertising and transcript questions afresh, in the context of our holding reinstating the fee limitation. We therefore vacate the approval of the changes in the advertising and transcript provisions, and remand this cause to the District Court for a new finding whether these changes should be approved. We intimate no view on the merits of this remaining question. The District Court may, if it chooses, in turn remand to the Special Masters for them to address this issue in the first in-

---

**6.** The University "takes no position on appeal" on the merits of the change in the transcript provision. Reply Brief of Appellants and Cross-Appellees 24. In fact, as the University points out, the nature of this change is less than clear. The original decree does not require in so many words that a transcript be automatically prepar-

ed in every case, but apparently it has been so applied in practice. At any rate, transcripts have been available to any interested person. Under the change adopted by the District Court, transcripts would not be prepared unless requested by a party to the individual claim.

stance. The District Court may, but need not, receive additional evidence on remand.

In No. 83–1371, the judgment is reversed in part, vacated in part, and remanded with instructions. The cross-appeal in No. 83–1425 is dismissed as moot.

It is so ordered.