Dan DURAN, et al., Plaintiffs-Appellees,

v.

Richard J. ELROD, et al.,
Defendants-Appellants.

No. 85–1534.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1985.

Decided April 12, 1985.*

Opinion April 26, 1985.

Flaum, Circuit Judge, filed dissenting opinion.

Ruthanne DeWolfe, Richard Hess, Robert E. Lehrer, Legal Assistance Foundation, Chicago, Ill., for plaintiffs-appellees.

Henry A. Hauser, Chief Civil Actions Bureau, Chicago, Ill., for defendants-appellants.

* By unpublished order, with notation that opinion would follow.

Before CUMMINGS, Chief Judge, and POSNER and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

The administrators of the Cook County (Illinois) Jail appeal from an order refusing to lift, for seven weeks, a provision in a class-action consent decree regulating the living accommodations in the jail. The jail houses people who are awaiting trial on criminal charges because they have been denied bail or (more commonly) have been unable or unwilling to post the amount of cash required to make bail; it also houses convicted defendants en route to a penitentiary to serve their sentence, but they are not involved in this litigation. In 1974 a class action was brought on behalf of the pretrial detainees against the Cook County officials ("County," for short) in charge of the jail. The suit, which charged that conditions in the jail were so harsh, unsafe, and unsanitary as to constitute punishment of pretrial detainees in violation of the Fourteenth Amendment's due process clause, was settled in 1982 by the entry of a consent decree. The decree places numerous restrictions on the jail. Living space, food, exercise, law books, grievances, security, and visits are all regulated by the decree. The decree appoints the John Howard Association, a private (and we add, highly respected) group concerned with prison conditions, to monitor, like a special master, the County's compliance with the decree.

One provision of the decree forbids "double bunking" (double occupancy of a cell) in Division I of the jail. Division I was built in 1927, and its cells, even after having been doubled in size as required by another provision of the decree, are only 8 feet by 8 feet in size (64 square feet). In 1983, with the jail population growing rapidly, the County asked the district judge who had approved the decree to modify it to permit double bunking in Division I until the jail was enlarged. The judge (1) denied the motion and (2) ordered the County to release as many pretrial detainees on their own recognizance (that is, without making them put up any bail money) as necessary to keep the jail's population at 4,500 (approximately the number of beds), and to do so in reverse order of the size of their bonds, so that low-bond pretrial detainees would be released before high-bond ones (if the bonds were of equal size, the inmate who had been in jail the longest had to be released first). The County appealed; this court affirmed both the "cap" order and the denial of the motion to modify the decree. *Duran v. Elrod*, 713 F.2d 292, 297–98 (7th Cir.1983).

With the number of people charged with crime in Cook County continuing to grow rapidly, it became impossible to comply with the "cap" order by releasing just inmates awaiting trial on misdemeanor charges. In the first six months of 1984 the County had had to release 6,434 inmates to avoid having to double bunk; in the last six months this number rose to 9,462. Beginning in November 1984 the County began releasing inmates awaiting trial on felony charges, and by March of this year it was apparent that the release of these inmates was a menace to public safety. A study showed that 311 of the 1,474 inmates who had been released on their own recognizance in January pursuant to the district judge's order were accused felons and that by March 12, 53 of the 311 accused felons had become fugitives. Others had been convicted, acquitted (or the charges against them dropped), or otherwise removed from the status of pretrial detainee. Of the 154 accused felons against whom charges were still pending on March 12 (other than the fugitives), 16 had already been arrested for subsequent crimes—10 for felonies and 6 for misdemeanors. They undoubtedly had committed other crimes that had not resulted in arrests, for most crimes are not solved, and most of the accused felons released pursuant to the judge's order have substantial criminal records. This is not because the County willfully selects the most dangerous people to release but because the "cap" order required that those with the lowest bonds be released first, regardless of the nature of the crime or the

defendant's record, and because the jail has run out of low-bond inmates to release. To comply with the judge's order the County now is routinely releasing inmates with bonds as high as $5,000 ($500 in cash), even though, as its study shows, many of the released inmates will become fugitives, or commit felonies while awaiting trial, or become fugitives and commit crimes.

On March 27 the County filed a motion asking the district judge to modify the consent decree to allow double bunking of accused felons until May 15, when the renovation of an existing building at the jail and the completion of a new one will add 738 new beds. The judge denied the motion, noting that the County had dragged its heels in constructing new facilities to relieve overcrowding and suggesting that the County devise a system for releasing on their own recognizance the least dangerous persons accused of felonies. The County appealed to us, as it was entitled to do under 28 U.S.C. § 1292(a)(1) since the judge's order was the refusal to modify an equitable decree. Following oral argument on April 12, we issued an order, effective immediately, reversing the district court's order and granting the modification requested, with the notation that this opinion would follow.

From the recital of facts it should be clear that the plaintiffs' first argument—that our previous opinion definitively establishes the lack of merit in the County's request—is itself without merit. The issue before us two years ago was different from the issue today:

1. The decree had been entered only a year before.

2. The modification sought was not limited to a definite time period; the County wanted the prohibition against double bunking postponed until the expansion of the jail was complete—a matter (it has turned out) of years, not weeks.

3. The County had not even begun the construction required to comply with the decree.

4. Many of the inmates being released on their own recognizance could have made bail with less than $100 in cash, see 713 F.2d at 298, and we regarded these inmates as unthreatening. There was no suggestion that accused felons might have to be released, and there was nothing corresponding to the study of flight and recidivism that the County has put in to support its present request to modify.

We must therefore consider the merits of that request.

A court of equity has the power "to modify an injunction in adaptation to changed conditions though it was entered by consent," *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932), and this regardless of whether there is an express reservation of the power: "A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *Id.* Although recent decisions have suggested that a more liberal standard than that laid down in *Swift* for exercising the power to modify (the standard in *Swift* is whether there has been "a clear showing of grievous wrong evoked by new and unforeseen conditions," *id.* at 119, 52 S.Ct. at 464) is appropriate in the case of decrees supervising public institutions, see *New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 970 (2d Cir.1983); *Alliance to End Repression v. City of Chicago,* 742 F.2d 1007, 1020 (7th Cir.1984) (en banc) (dictum); *United States v. City of Chicago,* 663 F.2d 1354, 1359–60 (7th Cir.1981) (en banc); *Newman v. Graddick,* 740 F.2d 1513, 1520–21 (11th Cir. 1984); *Philadelphia Welfare Rights Organization v. Shapp,* 602 F.2d 1114, 1120–21 (3d Cir.1979); but see *Rajender v. University of Minnesota,* 730 F.2d 1110, 1115–16 (8th Cir.1984) (citing cases), we have no occasion in this case to consider an alternative standard. Even if the *Swift* standard applies with full force, the district judge's refusal to modify the decree for the short period of time requested by the County must be reversed.

Two principles, one having to do with the limits of judicial competence, the other a conventional principle of equity jurisprudence, frame our analysis.

1. Federal judges must always be circumspect in imposing their ideas about civilized and effective prison administration on state prison officials. See *Block v. Rutherford*, — U.S. ——, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984); *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Rhodes v. Chapman*, 452 U.S. 337, 351 n. 16, 101 S.Ct. 2392, 2401 n. 16, 69 L.Ed.2d 59 (1981). The Constitution does not speak with precision to the issue of prison conditions (that is an understatement); federal judges know little about the management of prisons; managerial judgments generally are the province of other branches of government than the judicial; and it is unseemly for federal courts to tell a state or city or, as here, a county how to run its prison system. Of course the County agreed to a consent decree which severely limits its freedom of action, but the County is not the state. Federal courts must be wary of entanglement in the intramural struggles of state or local government.

2. When an equity decree affects other people besides the parties to it, the judge must take account of the interest of those people—the public interest—in his decision whether to grant or deny equitable relief. See, e.g., *Yakus v. United States*, 321 U.S. 414, 440–41, 64 S.Ct. 660, 674–75, 88 L.Ed. 834 (1944); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 388 (7th Cir.1984). This is true whether the judge is being asked to approve a decree, see, e.g., *Donovan v. Robbins*, 752 F.2d 1170, 1176 (7th Cir.1984), or interpret a decree, see, e.g., *Alliance to End Repression v. City of Chicago, supra*, 742 F.2d at 1013, or, it seems evident, modify a decree. Therefore, in deciding whether the County had shown a "grievous wrong" due to "new and unforeseen conditions" such as would justify the limited modification sought, the judge had to consider not only the burden of the modification on the plaintiffs, and the benefits of the modification to the county government, but also the benefits and burdens to the public.

Let us consider how these factors balance out in the present case. We begin by noting that the plaintiffs had only a limited interest in opposing the modification. Although the decree, consistently with progressive thinking about jails, see American Correctional Ass'n, Standards for Adult Local Detention Facilities 30, 37 (2d ed. 1981), forbids putting two inmates in the same cell in Division I of the Cook County Jail, the Constitution does not forbid it. (This distinguishes *Inmates of Allegheny County Jail v. Wecht*, 754 F.2d 120, 127 (3d Cir.1985), on which the plaintiffs rely.) The conditions of imprisonment, whether of pretrial detainees or of convicted criminals, do not reach even the threshold of constitutional concern until a showing is made of "genuine privations and hardship over an extended period of time." *Bell v. Wolfish*, 441 U.S. 520, 542, 99 S.Ct. 1861, 1876, 60 L.Ed.2d 447 (1979). See generally Fletcher, *The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy*, 91 Yale L.J. 635, 683–88 (1982). Some of the parts of this decree may be necessary to prevent such privations and hardship but the prohibition against cellmates in Division I, the only part of the decree the County has sought to modify, is not one of them. In *Bell v. Wolfish* the Supreme Court upheld double bunking of federal pretrial detainees in cells only slightly larger than those in Division I—75 square feet—albeit in a modern jail. See 441 U.S. at 526, 541–43, 99 S.Ct. at 1867, 1875–76. In *Rhodes v. Chapman* the Court upheld double bunking of convicted criminals in state prison cells even smaller (if barely) than those involved in this case—63 square feet. In *Smith v. Fairman*, 690 F.2d 122, 124, 126 (7th Cir. 1982), we upheld double bunking, again of convicted criminals in state prisons, in cells of only 56 square feet. See also *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 996, 998–1000 (3d Cir.1983).

If all this sounds like a reversion to the Dark Ages, remember that these cells are mainly for sleeping; in Cook County Jail, the inmates are required to be in their cells only from 11 p.m. to 6 or 7 a.m., and they can spend the rest of the day watching television or exercising or using the law library or the chapel. The decree itself allows either double bunking (though in larger cells—100 square feet), or large dormitory rooms with up to 52 inmates in them, in every other division of the jail. A delay in compliance of seven weeks is not "an extended period of time" even for persons detained the entire period, as of course many pretrial detainees will be. *Rhodes* and *Smith* upheld double bunking in cells no larger than those in Division I for convicted criminals, who unlike pretrial detainees may be kept in such cells for years, sometimes for many years—though on the other hand they *have* been convicted, and pretrial detainees have not been. Double bunking could of course violate the Constitution if the cells were much smaller, cf. *Wellman v. Faulkner,* 715 F.2d 269, 274 (7th Cir.1983), or if in a particular case the double bunking were shown to cause "violence, tension and psychiatric problems," as in *Toussaint v. Yockey,* 722 F.2d 1490, 1492 (9th Cir.1984), but there is no suggestion of that here.

Granted, a party often gives up more in a consent decree than it is legally obligated to give up, usually in exchange for something; so the fact that the County was not legally obligated to abandon double bunking in Division I of the Cook County Jail by no means deprives the inmates of a legitimate interest in the continued observance of that part of the decree. To place this interest in perspective, however, it should be noted that the current crop of pretrial detainees was not in the jail when the decree was signed in 1982. It is only by treating the class in this class action as if it were a single person and the County too as if it were a single person and ignoring the effects of the decree on nonparties—the law-abiding population of Cook County— that it becomes possible to fit the decree into the familiar framework of contract law

and insist that it be enforced to the hilt. A consent decree that regulates a public agency "is no mere contract, even though reference to contract principles may be useful." *New York State Ass'n for Retarded Children, Inc. v. Carey,* 596 F.2d 27, 37 (2d Cir.1979); *Alliance to End Repression v. City of Chicago, supra,* 742 F.2d at 1013.

This is not to say that the decree ought just be discarded—a suggestion the County has not made. No one will sign a consent decree if the other party is free to walk away from it. But in deciding whether to modify a decree the district judge cannot just appeal to the sanctity of contracts; he must consider the concrete impact of modification on both parties, and also on the public. And in considering the impact on the inmates who would be double bunked if the decree was modified, the judge could not properly assign controlling weight to the inmates' preference for single cells: that is, for accommodations superior to those of many and perhaps most inmates of American jails—including inmates in other divisions of Cook County Jail, who must share cells which are larger than, but not twice as large as, those in Division I, or else sleep in dormitory rooms.

 Against the modest hardships of double bunking the district judge had to weigh the evidence of what the accused felons who had been released in January had done in the short time since their release. Extrapolating from the County's study, the accuracy of which is not disputed, one would expect that unless the modification were granted some 500 accused felons would be released on their own recognizance between the date of the request (March 27) and May 15. (This estimate is based on the average daily number of accused felons released in January—10.) Of the 500, almost 100 would quickly become fugitives. Another 25 or so would be arrested for crimes within a couple of months, and two-thirds of the arrests would be for felonies. But arrests are just the tip of the iceberg. Fewer than 20 percent of the seven "index" crimes (murder, aggravated assault, forcible rape, rob-

bery, larceny-theft, burglary, and motor-vehicle theft) are cleared by arrest. U.S. Dept. of Justice, Bureau of Justice Statistics, Report to the Nation on Crime and Justice: The Data 52 (Oct. 1983). Fewer still are cleared by an arrest made within a month or two of the crime. To loose 500 accused felons, most with felony records, on the people of Cook County within a period of seven weeks is to launch a crime wave, and thereby impose a greater cost on society than the cost to the inmates' expectations, and to the sanctity of consent decrees, of allowing the limited modification that the County sought.

It is not a sufficient rebuttal that if only the 500 accused felons could make bond they would be released anyway, and that accused felons who do make bond and are released jump bail, or are arrested while out on bail, apparently at the same rate as shown in the County's study of the accused felons whom it was forced to release on their own recognizance in order to comply with the consent decree. The detention of persons who cannot raise the cash required to make bond is lawful—there is no suggestion that the Illinois judiciary is setting bond too high—and thus confers a legitimate (though incidental) benefit on the law-abiding population.

It is also not a sufficient rebuttal to point out that if the County had made a greater effort to expand the jail, it would not now be in the position of having to release on their own recognizance accused felons who cannot post the required bond. No doubt the County could have done more (a point we shall come back to). Still, that jails and prisons are expensive to build (in part because of the amount of steel required), as well as to operate, is well known; that state and local legislatures are reluctant to appropriate money, or taxpayers to vote bond issues, to build or expand jails and prisons is well known; that neighborhoods resist the construction or expansion of jails and prisons, sometimes by reference to environmental impact, as in *First National Bank of Chicago v. Richardson,* 484 F.2d 1369 (7th Cir.1973), and *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir.1972), is well

known; that delay in any sort of building construction is endemic is well known; and that the jail and prison population is expanding (by 41 percent since 1980, nationwide) as society redoubles its efforts to deal with crime is well known. The consent decree was signed only three years ago, on the eve of what has turned out to be an unremitting increase in the number of persons in Cook County ordered jailed for failure to make bond. Against this background the County's request for seven weeks of grace seems not unreasonable. The County promised emphatically at the argument of this appeal that it would not request a further extension (and we add: it had better not renege). We hesitate to treat the County officials as if they were naughty boys who had repeatedly failed to hand in their homework on time.

Nor is it a proper reply to their arguments that the courts of Cook County should be setting lower bail for nonviolent than for violent accused felons in order to make sure that the district judge's 1983 "cap" order does not force the release of any persons accused of committing violent felonies; or failing this that the County should ask the district judge to modify the decree so that the County can release the nonviolent first even if they have higher bonds. This argument assumes that only violent felons should be required to post bond at all and that the others should be routinely released on their own recognizance. It is not for federal courts to decide which state crimes are serious and which not, or what bond (if any) state judges should set, or how much authority state prison officials should have to release prisoners whose conditions of confinement are not unconstitutional. The plaintiffs want the Cook County Jail to preempt the bail decision. Federal judges have no authority to reallocate power among the branches of state and local government.

Of course the fact that we find the County's argument for modification a compelling one does not in itself justify our reversing the district judge's denial. Bearing in mind that a request to modify a decree is

normally and here an appeal to the judge's equitable discretion, that (to make the same point in a slightly different way) it normally requires a judgment for which there is no fixed and definite legal standard, and that a judge who has lived with a decree for years knows far more about it than an appellate court which reviews one or a few of the orders made in administering the decree, we reaffirm the principle stated in a previous appeal in this matter that the standard of judicial review is deferential. In the familiar formulation, the district judge's balancing of the competing interests will not be set aside unless we can call it an "abuse of discretion." *Duran v. Elrod, supra,* 713 F.2d at 297; see *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973).

The principal grounds on which the judge turned down the request to modify the decree were (1) this court's affirmance of his earlier order in *Duran v. Elrod, supra,* and (2) his belief that the County had created the fix it was in by having failed to enlarge the jail fast enough. The first ground overlooks the many differences between the facts before us in the earlier appeal and the present facts. The second ground amounts to saying that the County must be punished for its foot-dragging. Only it is not the County that will be punished; it is the citizens of Chicago and Cook County, especially those who live in high-crime neighborhoods. True, the more tightly the County is held to the terms of the decree, the more likely are other parties to consent decrees to comply rather than seek modification. But this is too powerful a ground for denying a particular request to modify; it is a ground for never allowing a consent decree to be modified. And it is only in the short run that denying all modifications will promote the observance of consent decrees. Parties will be reluctant to sign a consent decree if they will be locked into its terms however the future may unfold. *Philadelphia Welfare Rights Organization v. Shapp, supra,* 602 F.2d at 1120.

But our principal disagreement with the district judge concerns the interest of potential victims of the accused felons who are to be released though they cannot meet the lawful terms of their bonds. It is a mistake to treat a case like this as if the County were the private owner of a slum who was making his tenants live in inhuman conditions in violation of a court decree. More than the interests of the parties are engaged; the interest of the public in being secure in their persons and property is engaged. Cf. *United States v. Board of Education of City of Chicago,* 744 F.2d 1300, 1307–08 (7th Cir.1984). The fugitive and recidivist data that the County compiled and that were not foreseen when we rebuffed the County's attempt to obtain a similar modification of the decree two years ago constitute a sufficient change in circumstances to establish a clear justification for the very limited modification that was sought, especially considering the County's substantial though incomplete efforts to comply with what is after all an onerous decree. Granted, the overcrowding of pretrial detainees that prompted this litigation has not been overcome completely. But the cells in Division I have been doubled in size pursuant to the consent decree; another building has been renovated and a new building has been constructed and is about to be put into service; and the County has complied with the other parts of the decree, relating to day rooms, exercise facilities, visiting hours, greater staff, better food and hygiene, and greater access to the law library. Although the district judge has overseen the administration of the decree with energy and imagination, his denial of the County's current request to modify the decree must be considered reversible error in light of his failure to give any significant weight to the follow-up study of pretrial detainees who have been released in recent months pursuant to his 1983 order, the very limited nature of the modification sought, and the County's progress toward full compliance with the decree.

Ordinarily in a case where a judge has failed to exercise his discretion properly, the remedy is to remand the case for a

further exercise of discretion. But time will not permit that solution here. That is why after the argument of the appeal we issued an order granting the requested modification. Had time permitted we would have remanded the case for reconsideration by the district judge in accordance with the principles set out in this opinion.

In view of the public attention that this case has received, we end with some general observations. In the last year some 10,000 inmates have been released from Cook County Jail on their own recognizance after having failed to post the modest amounts of cash required by bonds lawfully set by state courts. These prisoners were told in effect and perhaps in so many words that although state judges had told them they would have to stay in jail until trial if they failed to post the cash required by their bonds, the federal court had ordained that, to ensure compliance with a consent degree forbidding the common and constitutional practice of double bunking used in every division of the Cook County Jail except Division I, they were free to walk. They proceeded to become fugitives in large number and to commit felonies and other crimes in large number. With the County within seven weeks of completing facilities that will eliminate double bunking in Division I, and in possession of information demonstrating beyond doubt the propensity of inmates released under the district judge's order to become fugitives and to commit more crimes, the County asked for a variance from the consent decree to permit double bunking just during that interim. It was refused. The effect was to punish the County, by punishing its law-abiding citizens, for the County's past failures to carry through with dispatch a building program necessary to implement a provision of the decree that is not required by the Constitution. This refusal was improper.

So the decree must be modified; but in ordering it modified (just till May 15, we stress) we want to make clear our dissatisfaction with the County's behavior in this litigation, though we think the judge over-reacted to that behavior. Leaving aside the question why the County agreed to a flat prohibition of a practice that could not have been thought unconstitutional in 1982, we still fail to understand why the County asked for modification of the decree in 1983 when it was too early to make a convincing case for modification and the attempt could only undermine the credibility of its later request to modify, why the County repeatedly gave the district judge unrealistic estimates of the progress of its building program, why three years after the consent decree was entered there are still inmates sleeping on the floors of the jail, and why as late as March 21 of this year the jail was holding 76 people whose bonds were $3,000 or less while releasing many people with $5,000 bonds. But while the County's conduct invites and deserves censure, and while the renovation and expansion of the jail may prove to be too little as well as too late, we do not think it a proper sanction to deny the present request to modify, which must as we have emphasized be considered from the standpoint of the public as well as of the parties, and with due recognition for the practical difficulties that the County faced and has largely if not completely overcome. The district judge took too narrow a view of his responsibilities in adjudicating the request; we regret that the exigencies of time force us to substitute our own view without giving him an opportunity for reconsideration.

REVERSED WITH DIRECTIONS.

FLAUM, Circuit Judge, dissenting.

I respectfully dissent. On rare occasions, quite often in an expedited fashion, cases are unfortunately brought to this tribunal that generate a great deal of heat but shed precious little light. The instant litigation appears to fall into this sad category.

Although I share the majority's concern with the circumstances surrounding the interpretation of this consent decree and can empathize with the desire to provide for more flexibility in its implementation, the

assigned role of this appellate panel is the narrow one of determining whether the court below has committed an abuse of discretion. *Ferrell v. Pierce*, 743 F.2d 454, 461 (7th Cir.1984). *Cf. Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 390 (7th Cir.1984) (In reviewing trial court rulings on preliminary injunctions, "[t]he question for us is whether the judge exceeded the bounds of permissible choice in the circumstances, not what we would have done if we had been in his shoes."). Inviting as the majority opinion is in its reflections about the particular situation before us, it is my belief that the less said about the perimeters and purpose of this specific consent decree the better, in the context of this rushed review. The Court of Appeals is simply not the appropriate forum for fact-finding regarding matters that are uniquely the province of the district court. *See, e.g., Anderson v. City of Bessemer City*, —— U.S. ——, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

However persuasive might be an individual appellate judge's view of how this matter could have been better handled below, I am forced to conclude that the appellants have made an insufficient showing to justify a finding of an abuse of discretion by the district court in this case. The district court in its singular role has made a decision concerning a limited time extension against the background of a multi-year and complex consent decree. We currently sit in judgment on his exercise of discretion in this specific instance and not on the wisdom or eventual correctness of this particular holding. It is not for us to determine whether "the County's request for seven weeks of grace seems not unreasonable," *ante* at 761, or to reweigh the relevant factors to "consider how these factors balance out in the present case," *ante* at 759.

Whether considered under the traditional standard for obtaining modification of a consent decree enunciated in *Swift, supra,* and applied by the majority—or under the more liberal standard that the majority opinion suggests may be emerging for decrees supervising public institutions—I cannot conclude that the court below abused its discretion. There is simply no evidence in this record to justify my brothers' conclusion that the court below failed to weigh any of the factors that they outline as pertinent to the decision in this case. Indeed, the record reflects that the district judge expressly considered the crime statistics submitted by the county and relied upon by the majority. I would respectfully suggest that my colleagues' real disagreement lies with the conclusion that the trial judge reached after engaging in the discretionary balancing process rather than with how he arrived at that conclusion.

The majority opinion speaks of time constraints. But we should not be stampeded into a review of a district court decision that has not been clearly shown to have been recklessly or imprudently arrived at or to be without sufficient basis in this long-term litigation—especially when one recognizes the traditionally broad discretionary powers of the district court. I would strongly suggest that respect for the distinct roles of district and circuit courts overshadows the so-called emergency that has been urged if not thrust upon us. Legally-engineered heat waves do not build records upon which to establish the likelihood of potential crime waves.

While I do not suggest that an abuse of the appellate process has occurred in this case, an argument could be made that a clear misuse has occurred. In an era of overcrowded trial and appellate dockets, that this appeal had to be heard reflects poorly upon our system's efforts to resolve at the district court level essentially reconcilable legal conflicts. A skeptical viewer might speculate that double bunking of a relatively few individuals for a comparatively short time is not at the heart of this appeal and that the litigants are well aware of this fact.

An experienced trial jurist and competent counsel for both sides are involved in this continuing and extensive litigation. Their not insignificant collective talents should be able to prevent further detours to progress.