Lera Greer MATHIS, Plaintiff,

v.

TEXAS INTERNATIONAL PETROLE-UM CORPORATION, Atlantic Richfield Company and Eurafrep, A Subsidiary of Eurafrep, S.A., Defendants.

Civ. A. No. W–84–CA–152.

United States District Court,
W.D. Texas,
Waco Division.

Feb. 7, 1986.

J. Anthony Hale, J. Anthony Hale, P.C., Houston, Tex., for plaintiff.

J. Clifford Gunter, III, Bracewell & Patterson, Houston, Tex., for defendants, Tex. Intern. Petroleum Corp. and Atlantic Richfield Co.

William T. Hankinson, Thompson & Knight, Dallas, Tex., for defendant Eurafrep, Inc.

## MEMORANDUM OPINION AND ORDER

WALTER S. SMITH, Jr., District Judge.

Came on this day to be considered Defendants' Motion for Partial Summary Judgment. The Court, having considered said motion, the responses filed thereto, and having heard argument from counsel on this issue, enters the following memorandum opinion and order.

It is appropriate for the Court to grant a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure when there exists no genuine issue of material fact. *See Meredith v. Hardy,* 554

F.2d 764 (5th Cir.1977). In the case at bar, the Court finds no genuine issue exists as to any material fact regarding Plaintiff's claims for breach of contract and release of acreage, and is of the opinion that a partial summary judgment should be entered for Defendants on those claims.

## I. *Jurisdiction*

Plaintiff's complaint was originally filed in the 278th Judicial District Court of Leon County, Texas, and the cause was properly removed to this court by defendants pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441(b). Plaintiff is a resident of Leon County, Texas. Defendant Atlantic Richfield Company ("ARCO") is a Pennsylvania corporation with its principal place of business in Los Angeles, California. Defendant Eurafrep, Inc. ("EURAFREP") is a Delaware corporation with its principal place of business in a state other than Texas. Defendant Texas International Petroleum Corp. ("TIPCO") is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma. Diversity jurisdiction therefore exists in accordance with 28 U.S.C. § 1332. The amount in controversy exceeds the sum of $10,000 exclusive of interest and costs. This court, therefore, has jurisdiction to hear this case.

Plaintiff's first amended complaint against defendants TIPCO, ARCO, and EURAFREP alleges breach of contract, breach of the implied covenant to produce proper quantities from existing wells, breach of the implied covenant of further exploration, a request for a release of acreage outside the two producing oil units, and seeks damages for real property damage. The motion for partial summary judgment filed by Defendants TIPCO and ARCO and joined in by EURAFREP relates only to the claims for breach of contract against TIPCO and the claim for a release of acreage against all three Defendants.

## II. *Release of Acreage*

■ The Plaintiff, Mrs. Lera Greer Mathis, as lessor, and Defendant TIPCO, as lessee, executed an Oil and Gas Lease ("Mathis Lease") on December 9, 1977, as part of TIPCO's "Pigeon Roost Project".

The Mathis lease covered 653.44 acres of land located in Leon County, Texas. The lease is composed of two tracts of land; the first tract consists of 322.44 acres and the second tract consists of 331 acres. The lease contained a five year primary term within which the lessee had to begin operations. The lease also contained a "pooling" clause and a "Pugh" clause. Defendants ARCO and EURAFREP have been assigned interests in the mineral rights by TIPCO.

Production was obtained on the property through two producing oil wells before the expiration of the primary term. On November 20, 1981, Defendant TIPCO executed two instruments entitled "Declaration of Pooled Unit" which referred to the two producing wells on the Mathis property. These wells were referred to as the "Mathis No. 1" and the "Mathis No. 2". The land described in these two instruments is contained wholly within the Mathis lease.

The Court finds that the facts material to the "pooling" clause and the Pugh clause embodied in the Mathis Lease are undisputed. Neither party disputes the validity of the lease for its primary term of five years beginning December 9, 1977 and continuing to December 8, 1982. Neither party disputes that the lease would continue in effect after December 8, 1982 as long as "operations" continued on the leased land and unless the Pugh clause operated to limit the acreage of the continued leasehold to a "pooled" unit or units. Neither party disputes that one producing well is present on each of the two Mathis tracts and that the presence of those wells would constitute "operations" sufficient to extend the entire lease were it not for the Pugh clause. And further, neither party disputes that Defendant TIPCO filed two Declarations of Pooled Unit, each describing 40 acres surrounding the two producing wells and each describing acreage wholly within the Mathis lease.

The dispute thus boils down to an interpretation of the lease and especially the pooling clause and the Pugh clause. The

Court finds that there is no ambiguity in the language of the Mathis lease. The interpretation of the lease is thus a matter of law, and the Court will look to the lease agreement alone as an expression of the intention of the parties. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515 (Tex.1968).

The first question of interpretation is whether a "pooled unit" was created by TIPCO pursuant to the lease. The Court finds that two "pooled units" were created by the Declarations filed by TIPCO November 20, 1981. The provisions of Paragraph 4 of the Mathis lease describe the usage of "pooled units" within the terms of the lease:

> Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease *with any other land covered by this lease* and/or with any other land ... *so as to establish units*.... (Emphasis added.).

Defendant TIPCO in fact exercised this option and created two "pooled units" by its November 20, 1981 Declarations. Whether these "pooled units" conform to the usage of the term "pooled units" in similar leases is not relevant here, because the Pugh clause, Paragraph 15, refers only to *"a pooled unit* or units *established under the provisions of Paragraph 4* ... (Emphasis added.)."

The question then is whether the Pugh clause operates to release the leased acreage outside of the "pooled units" from provision for continuation of the lease beyond its primary term. The Pugh clause provides in relevant part as follows:

> [A]fter the end of the primary term drilling operations on or production from ... a pooled unit or units established under the provision of Paragraph 4 hereof *which unit embraces land covered hereby and other land,* shall maintain this lease in force only as to all [minerals] ... under the surface of the land described in any instrument or instruments identifying any unit or units ... (Emphasis added.).

This wording unambiguously provides an additional requirement before the pooling of units is to trigger operation of the Pugh clause: the "pooled unit" must embrace Mathis lease land *and other land.* As noted before, it is undisputed that the "pooled units" created by TIPCO embraced land on the Mathis lease only. Therefore, the provisions of the Pugh clause are not triggered into effect by the Defendant's pooling of units; consequently, the other provisions of continuing the lease will apply.

It is undisputed that without the Pugh clause restriction, the two producing wells on the Mathis tracts operates to continue the lease.

With the lease so construed, the Plaintiff's cause of action for release by the Defendants of the non-pooled acreage of the Mathis lease is without merit as a matter of law.

### III. *Breach of Contract*

In 1982, nearing the end of the five year primary term, TIPCO began negotiations with Mrs. Mathis to renew her lease. The negotiations occurred between Ms. Carla J. Albright, an agent of TIPCO, and Dr. Tommy Shultz, Mrs. Mathis' nephew. Dr. Shultz also acted as an agent for his mother and another aunt, Mrs. McWilliams, in leasing their interests in additional property within the Pigeon Roost Project. Negotiations proceeded for several months with several drafts of leases being exchanged and modified.

On April 27, 1982, Dr. Shultz sent a letter to Ms. Albright stating that he was enclosing a proposed lease sent to him from TIPCO with some changes he felt were necessary before the lease could be accepted.

On May 7, 1982, Ms. Albright responded to Dr. Shultz's letter of April 27. Ms. Albright enclosed four leases covering the interests of Dr. Shultz's mother, aunt Mrs. McWilliams and aunt Mrs. Mathis in the Pigeon Roost Project. One of the leases covered the Mathis property. The other three leases covered the interests owned by Mrs. Shultz and Mrs. McWilliams in addi-

tional property. These leases modified the proposed lease sent by Dr. Shultz on April 27.

Ms. Albright's May 7 letter contained, *inter alia,* the following paragraphs:

If you find the terms of these leases agreeable, please have the leases properly executed and each signature notarized. We also request that social security numbers are written in below each signature. Upon execution of the leases, please take the leases and attached bank drafts to the collections department of your bank. Your bank will then forward the drafts and leases to our bank for payment. TIPCO will then remit payment to your bank(s) for the amount due. Please retain a copy for your files.

Apparently, these leases were never executed because on May 21, 1982, Ms. Albright sent a brief letter to Dr. Shultz which reads as follows:

Dear Dr. Shultz:

Attached hereto please find one copy of the Lera Greer Mathis lease which has been agreed upon by both of us. I will inform you of the time that we will be able to meet with your Aunt on Thursday. Thank you for all of your help.

Sincerely,

s/Carla J. Albright

TIPCO representatives were scheduled to meet with Dr. Shultz and Mrs. Mathis on Thursday, May 27, 1982, to hand deliver a final copy of the lease and be present when Mrs. Mathis signed the lease.

The meeting referred to in the letter never occurred. TIPCO later determined that a new lease was not necessary due to their belief that the two producing oil wells were sufficient to hold the original lease beyond the primary term. This determination was conveyed to Dr. Shultz in a letter from TIPCO landman Michael L. Lee dated June 16, 1982.

Plaintiff's breach of contract claim arises from an assertion that Plaintiff and TIPCO had entered into a new lease dated May 21, 1982. Defendants contend that no new contract resulted for three reasons: 1) said contract would violate the Statute of Frauds; 2) there was no offer and acceptance; and 3) no consideration to support the alleged contract exists. The Court will address each of these contentions in turn.

## A. *Statute of Frauds*

■ Defendant TIPCO argues that enforcement of the contract is barred by the Statute of Frauds. Tex.Bus. and Comm. Code § 26.01 (Vernon 1968 & Supp.1985). However the signed draft given by TIPCO to Mrs. Mathis would be a sufficient memorandum of the contract to take it out of the Statute of Frauds. *Corona Petroleum Co. v. Jameson,* 146 S.W.2d 512 (Tex.Civ.App. —Ft. Worth 1940, *writ dism.* )

## B. *Offer and Acceptance*

■ As Defendants correctly point out, there must be an offer and acceptance to give rise to a contract. *Garcia v. Villarreal,* 478 S.W.2d 830 (Tex.Civ.App.—Corpus Christi 1971, *no writ* ). It is also a basic principle of contract law that the offerer can designate a specific form of acceptance. *Franklin Life Insurance Company v. Winney,* 469 S.W.2d 21 (Tex.Civ.App.— San Antonio 1971, *writ ref'd n.r.e.* ) The May 7th letter from Ms. Albright to Dr. Shultz contained a specific provision for the manner of Mrs. Mathis' acceptance of TIPCO's lease. Mrs. Mathis was to accept the lease by executing the lease, having her signature notarized and including her Social Security Number under her signature. She was to then take the executed lease with the bank draft to her bank. Her bank would forward these documents to TIPCO's bank for payment and the bank draft would then be honored.

The proposed lease included with this letter was dated May 5, 1982 and was not accepted by Mrs. Mathis. There were additional negotiations between Dr. Shultz and Ms. Albright from May 7 until May 21, 1982. Ms. Albright then sent a copy of another proposed lease for Dr. Shultz to review before TIPCO representatives met with Mrs. Mathis on Thursday, May 27, 1982, to execute the lease.

The proposed lease included with the May 21 letter was one which, according to the letter, the parties had "agreed upon." Even so, the agreement was not yet binding because the designated requirements of acceptance had not been met. This proposed lease is best characterized as one which the plaintiffs considered accept*able*, but not yet accepted. Negotiations continued between Dr. Shultz and TIPCO and the formalities of acceptance were agreed to be postponed until Thursday, May 27. On that date, the original of the lease was to be hand delivered by TIPCO to Mrs. Mathis for her signature. The Thursday meeting never occurred and Mrs. Mathis never signed the lease.

The Court finds it undisputed that the method of acceptance as prescribed by TIPCO and as understood by both parties, was to include the actual signing of the lease by Mrs. Mathis (Letter of May 7; Plaintiff's Reply to Defendant's Response, p. 3; Shultz deposition, pp. 43, 46.) It is also undisputed that Mrs. Mathis never signed the lease and that the negotiations were discontinued by the letter dated June 16.

The law is well-settled in this area: No binding contract was formed because Mrs. Mathis did not accept the TIPCO offer in the prescribed manner. Her power to accept was then terminated by the revocation of the offer. The parties are left in the same position as before. *Town of Lindsay v. Cooke County Electric Cooperative Association*, 502 S.W.2d 117, 118 (Tex.1973); *Antwine v. Reed*, 145 Tex. 521, 199 S.W.2d 482 (1947); *Kurio v. United States*, 429 F.Supp. 42, 64 (S.D.Tex.1970).

### C. *Lack of Consideration*

■ The Defendants are also correct in pointing out that the alleged contract would not be enforceable for failure of consideration. This Court has already determined that the tracts of land which would have been covered by the new lease were already leased to TIPCO under the original Mathis lease. The Plaintiff thus would not have been able to convey the leasehold interest in those tracts to TIPCO because TIPCO already held them. The leasehold being already in the hands of TIPCO, it could furnish no consideration for a new lease contract with TIPCO. *Raynor Cattle Co. v. Bedford*, 91 Tex. 642, 45 S.W. 554 (1898).

### IV. *Conclusion*

This Court is empowered by Fed.R.Civ.P. 56 to enter summary judgment on claims where there is no genuine issue as to any material fact. In accordance with the foregoing,

IT IS ORDERED, ADJUDGED and DECREED that Defendants' (TIPCO, ARCO, and EURAFREP) Motion for Summary Judgment on the claim for release of acreage be and is hereby GRANTED. Plaintiff is to take nothing on this claim.

Additionally, IT IS ORDERED, ADJUDGED and DECREED that Defendant TIPCO's Motion for Summary Judgment on the claim for compensatory damages for breach of contract be and is hereby GRANTED. Plaintiff is to take nothing on this claim.

Additionally, IT IS ORDERED, ADJUDGED, and DECREED that Defendant TIPCO's Motion for Summary Judgment on the claim for punitive damages for breach of contract be and is hereby GRANTED. Plaintiff is to take nothing on this claim.

Said Judgment is to be without prejudice to or effect to Plaintiff's remaining claims for damage to the surface estate, for termination of the lease, for breaches of implied covenants, and for fees and costs associated therewith.

IT IS FURTHER ORDERED that discovery continue in this cause until April 4, 1986, and the parties shall submit an agreed pre-trial order by May 5, 1986.

IT IS SO ORDERED.