**TWELVE JOHN DOES, et al.**

v.

**DISTRICT OF COLUMBIA, et al., Appellants.**

No. 88–5254.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 26, 1988.

Decided Nov. 18, 1988.

Edward E. Schwab, with whom Charles L. Reischel, Frederick D. Cooke, Jr., Washington, D.C., and Paul A. Quander, Jr. appeared on the brief, for appellants.

Peter J. Nickles, with whom Alan A. Pemberton, Gaines H. Cleveland and David L. Russo, Washington, D.C., appeared on the brief, for appellees.

Before MIKVA and D.H. GINSBURG, Circuit Judges, and ROSENN,[*] Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This court is yet again faced with a dispute over the much-litigated condition of the District of Columbia's prison system. The District appeals from various orders upholding and enforcing the population lid established by consent decree for the Central Facility at the Lorton prison complex ("Central"). This opinion is in support of our previous speaking order affirming the district court's decision in the largest part. We vacate that portion of the district court's order which requires the District to make certain representations to the district court before transferring Central inmates to other D.C. facilities.

## I. BACKGROUND

Most of the District's prison facilities at Lorton have generated litigation from inmates protesting conditions as violations of the eighth amendment to the U.S. Constitution. Two lines of complaints resulted in consent decrees; two others went to trial. The suits protesting conditions at the Central Facility were resolved through one of the consent decrees, entered April 28, 1982. Inmates had complained that Central, built in the 1920s and arranged as a series of open-bay dormitories, subjected inmates to virtually unchecked violence, was overcrowded, dilapidated, understaffed, unsanitary and lacked necessary medical care. *Inter alia*, the District consented to a provision that prohibited it from incarcerating more than 1166 inmates in the facility.

On August 6, 1988, five days after the district court order now under review issued, there were 1491 inmates at Central,

---

* The Honorable Max Rosenn, of the United States Court of Appeals for the Third Circuit, sitting by designation pursuant to 28 U.S.C. section 291(a).

excluding the 86 prisoners in the P.G. Modular Unit which is not subject to the decree. This dropped to 1379 by August 31, climbed to 1451 on September 4 and dropped again to 1346 by September 26, the day this appeal was argued. The District of Columbia admits that it has failed to comply with the population ceiling for all but a two-month period since July 1987.

On July 16, 1987, plaintiffs moved that the District be held in contempt for violating the consent decree. The district court held the District in contempt and fined it $250 per day per overcrowded dormitory. But the District continued to pack more inmates into Central than permitted by the consent decree. In December, plaintiffs moved that sanctions be substantially increased. By the time of the hearing, on December 16, the District had removed a sufficient number of inmates that it was in compliance, and higher sanctions were denied. Only two months later, the District was violating the population lid again and has continued to do so since. This court upheld the contempt order on August 26, 1988, rejecting the District's claim that it was impossible for it to comply with the consent decree. Nonetheless, the District has continued to flout the order, seemingly treating the fines as license fees that buy it the right to prolong the dangerously congested conditions at Central.

While the District's appeal of the contempt order was pending, on May 25, 1988, plaintiffs moved to enforce the consent decree—if necessary, by an order that prisoners be released. After the hearing on that motion, the District moved to modify the population ceiling in the consent decree. The District did not request a specific change, but only that the parties be directed to meet and agree. The District rejected a proposal that the ceiling be raised 10 percent along with an increase in medical and correctional staff. The District also declined to file a breakdown of how many additional inmates it was requesting and what plans it had for additional personnel.

On August 1, 1988, the district court denied the motion to modify and issued several orders to specifically enforce the decree. It refused to issue a release order as requested but enjoined the District from assigning any more prisoners to Central and required it to remove at least 150 prisoners per month from Central until the population reached the decree's specified maximum of 1166. Compliance was to be reached by November 1 at the latest. In addition, in the certification provision which we vacate, the court enjoined any transfers of inmates from Central to another District prison unless the Director of the Department of Corrections first certified to the district court that the transfer would not threaten to violate his duty to provide for the adequate care, safekeeping, protection, instruction, and discipline of persons housed in the institution to which the inmates were being transferred.

The District contends that modification of the decree should have been granted because: there are changed circumstances unforeseen at the time it was entered—a massive increase in felony drug convictions; the District has made a good faith effort to comply with the decree; forced compliance would imperil the public interest by requiring release of prisoners. Further, the District maintains that the district court abused its discretion in issuing the injunctions.

## II. DISCUSSION

A consent decree, though negotiated by the parties, is a decree entered by a court and subject to the same judicial power to revoke or modify as any other court order. *See United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); *System Federation v. Wright*, 364 U.S. 642, 650–51, 81 S.Ct. 368, 372–73, 5 L.Ed.2d 349 (1961).

In *Swift & Co.*, the Supreme Court laid out the principle by which such decrees are to be construed: "The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow ... [and those subject to the decree are] suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression." *Swift & Co.*, 286 U.S. at 119, 52

S.Ct. at 464. Rule 60(b)(5) of the Federal Rules of Civil Procedure permits a court to modify a court order if "it is no longer equitable that the judgment should have prospective application." Fed.R.Civ.P. 60(b)(5). Modification is an extraordinary remedy, as would be any device which allows a party—even a municipality—to escape commitments voluntarily made and solemnized by a court decree.

In the past decade, several circuits have suggested that a more flexible standard is appropriate where the decree stems from litigation aimed at institutional reform. *See Philadelphia WRO v. Shapp*, 602 F.2d 1114 (3d Cir.1979), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980); *N.Y. Ass'n for Retarded Children Inc. v. Carey*, 706 F.2d 956 (2d Cir.), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983).

Several of our sister circuits have considered the circumstances under which it is appropriate to modify consent decrees entered in prison reform litigation. In some cases, material changes in operative law or circumstances have been found to warrant modification. *E.g., Nelson v. Collins*, 659 F.2d 420 (4th Cir.1981). But *predictable* changes in circumstances have been found *not* to meet this standard. *E.g., Ruiz v. Lynaugh*, 811 F.2d 856 (5th Cir.1987). Modification has also been held appropriate where the danger to the public of enforcement outweighed the interests of the prisoners in compliance, as courts sitting in equity are obliged to consider the interests of all those affected by a decree. *See Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir.1985) (*Duran II*).

The Supreme Court has said that wide discretion must be accorded to the district court in deciding whether to modify a consent decree because such a decision requires "a balance of imponderables." *System Federation*, 364 U.S. at 648, 81 S.Ct. at 371. There are limits to this discretion, though, and the district court's decision may be overturned if unreasonable or based on clearly erroneous findings. We have applied these teachings to our review and we are satisfied that the District of Columbia did not demonstrate such changed circumstances as would warrant modification or that the public would be harmed by enforcement of the decree as originally entered.

## A. *Changed Conditions Not Shown*

■ The District maintains that the number of prisoners in its system increased dramatically and unforeseeably, attributable entirely to increased felony drug convictions. This court has already found that overcrowding in the D.C. prison system was not unforeseen or unforeseeable. Judge Spottswood Robinson said in a prior appeal concerning this very decree: "The District has for years been aware of recurrent overcrowding in its prisons, and has not taken steps adequate to eradicate the problem." *Twelve John Does v. District of Columbia*, 855 F.2d 874, 877 (D.C.Cir.1988) (*Twelve John Does I*). Indeed, the population ceiling was included in the original 1982 decree because overcrowding was already an issue.

The District is correct that the number of prisoners has increased in the years since the decree was entered; it is incorrect in its implication that the increases occurred mostly in the past two years and in such a way that it was unable to prepare for them. According to the District's own figures, the number of prisoners in the entire system has increased every year since the lawsuit resulting in the consent decree was filed. For example, the average daily population of prisoners in the D.C. correctional system increased by 557 in 1984 over 1983, by 1260 in 1985 over 1984, by 924 in 1986 over 1985, and by 588 in 1987 over 1986. *See* Office of Criminal Justice Plans and Analysis, District of Columbia, 1987 Crime & Justice Report 21 (1988); Appellant's Brief at 5.

Thus, not only were continued increases entirely predictable but the District was forewarned to expect greater increases than have actually occurred, as the increase in prisoners in 1987 was markedly less than it had been in the two previous years. The District has not even attempted to explain why it did not, when the increase was 1260 inmates in one year (an

increase of 17.7 percent), plan for a future of major annual increases in prison population. In the three to four years since, it could have planned, constructed and opened new prisons. If it had based growth on the 1985 figures, it would now not only have solved its recurrent overcrowding problems, it would have room to spare.

The District complains that the system-wide increases have so badly overcrowded the other facilities in its system that it was forced to transfer prisoners to Central. But the extensive history of litigation for virtually every D.C. prison facility has long put the District on notice of the system-wide overcrowding. Moreover, the District was specifically warned more than two years ago, by retired Judge John D. Fauntleroy who was serving as a special assistant to the Mayor to monitor compliance with the Central decree, that the District's overcrowding of other facilities would soon force it to violate the Central decree.

Furthermore, the felony drug convictions situation is one the District itself made. When the District passed strong drug laws with greatly increased maximum sentences and, two years later, added mandatory minimums of as much as four years, the need for more prison space was obvious. The price for longer prison terms is always the need for more prison space. The District has had since 1981 to provide that space. It has not used those seven years to sufficient advantage.

B. *Harm to the Public Not Shown*

 Courts must weigh the public interest in having lawful sentences carried out and in being protected from dangerous criminals. *Plyler v. Evatt*, 846 F.2d 208, 213–14 (4th Cir.1988) (remanding to lower court to consider evidence that compliance would require releases from pool of high risk prisoners and that recidivism rate for such prisoners was 44.7 percent). The District maintains that its only means of complying with the decree is to release prisoners or to refuse new prisoners. Its claim to this effect must be rejected because it has made no showing as to who was in the

prison system nor how long they had left on their sentences. The district court found that compliance was possible by applying the procedures of the Prison Overcrowding Emergency Powers Act, D.C. Code § 24–901 (Supp.1988) to a greater number of inmates. *See* Findings of Fact, Conclusions of Law and Order Granting a Temporary Stay, No. 80–2136, at 3 (D.D.C. Aug. 4, 1988). That act permits corrections officials to shorten the sentences of non-violent offenders. The District did not even attempt to refute the finding that the population lid could be met by releasing such prisoners as misdemeanants with only a few weeks left to serve. Instead, it seems more interested in precipitating the maximum crisis by threatening to refuse to take any new prisoners into the system—even though it is obvious (and admitted in open court) that there are misdemeanants in the prisons who are far less dangerous to the public than the newly convicted felons who are being rejected. This may be an effective way to play a game of "chicken" with the U.S. Department of Justice to scare it into taking responsibility for housing new prisoners; it hardly is the way to establish the legal prerequisites necessary to effectuate a change in a consent decree.

The District's argument that Central is a medium-security facility housing felons is beside the point. The District is only being required to maintain an inmate population at Central of no more than 1166 prisoners. How the District arranges and rearranges the prison system to comply with that requirement is entirely its own concern. It could release misdemeanants or detainees from other facilities and transfer inmates from Central to those facilities. It could put misdemeanants in Central instead of felons. It has many options. But it is the District which is choosing which options to exercise, not this court.

The District's argument that the Emergency Powers Act is limited and that it has already used up its ability to release prisoners under it is also unavailing. Counsel would have this court accept some kind of schism between the District government and the District's prison system—as if there were two warring sovereignties to be

recognized. Patently, the District government is viewed as an entity in this court, and its *inter se* problems cannot excuse the District's legal commitments. It is within the power of the District of Columbia government to amend the Emergency Powers Act, to pass a new act or to provide whatever enabling legislation is necessary to comply with the decree to which it is legally bound. Nor would the District's position be improved by a showing that such legislation would encounter political difficulties. This court has already ruled that political obstacles do not reach the lack of power due to circumstances beyond one's control necessary to constitute an impossibility defense. *Twelve John Does I,* 855 F.2d at 878.

Furthermore, the District failed to make any showing that previous releases of prisoners under the Emergency Powers Act had placed the public in any danger. In *Duran II,* the Seventh Circuit did find that a significant percentage of released detainees became fugitives or committed serious felonies when released and this was sufficiently probative for the court to conclude that the danger of further releases outweighed the detainees' interest in defeating a temporary (seven-week) period of double-celling. 760 F.2d at 760–61, 763. The District, by contrast, provided no information at all about the results of its Emergency Powers Act release program thus far. Therefore the district court's conclusion that the results have not been inimical to the public interest must be sustained.

The District also failed to show that meeting the population ceiling at Central necessitates closing the prison system to new convicts. The district court found that closing the entire system would not be required; rather the District would have to, at most, make choices about which inmates should be confined. *See* Findings of Fact, Conclusions of Law and Order Granting a Temporary Stay, No. 80–2136, at 3 (D.D.C. Aug. 4, 1988). As discussed above, the District made no showing that such choices could not be made in harmony with the public interest. Counsel's argument before this court that the District would keep misdemeanants and arrested-but-still-pre-

sumed-innocent detainees in prison but refuse to incarcerate a convicted murderer is irresponsible bluster in a serious crisis. Nothing presented by the District suggests that the lower court's finding was clearly erroneous.

## C. *District's Good Faith Attempt to Comply Not Shown*

Many courts have considered whether the party moving for modification has shown a good faith attempt to comply in determining whether modification should be granted, especially in institutional reform situations. *See Philadelphia WRO v. Shapp,* 602 F.2d at 1120–21 (finding good faith and permitting modification); *Plyler v. Evatt,* 846 F.2d at 213 (same); *see also Duran v. Elrod,* 713 F.2d 292 (7th Cir. 1983) (finding that the state was deliberately trying to avoid compliance and denying modification), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 143 (1984). It is not clear whether these courts considered good faith to be a necessary predicate to modification or only a factor to be weighed. We need not reach this issue, however, because the record does not disclose that the District of Columbia has even begun to show a good faith attempt to comply with the Central decree.

The district court did not make an express finding on good faith. But its findings,

 a. that no new guards have been hired to cope with the overcrowding at Central,

 b. that the rate of assaults has risen,

 c. that the danger to both inmates and guards is exacerbated by the crowding,

 d. that if enforcement hearings had not been held, there would be even less progress toward building new facilities,

voice that court's certainty that the District has been remiss. *See* Memorandum, No. 80–2136, at 2–4, 6 (D.D.C. Aug. 1, 1988). We conclude that the district court's findings on these issues deserve especial deference because the district judge has personally supervised the implementation of this decree for the past six years and is unique-

ly privy to the behavior and motives of the parties.

### D. Enforcement Injunctions Were Not Abuses of Discretion

The District argues that the district court abused its discretion in ordering it not to admit any new prisoners into Central and to transfer 150 prisoners out of Central each month until it complied with the population ceiling in the decree. The District claims that it cannot comply without closing the D.C. system to new inmates and that a finding of an eighth amendment violation is a prerequisite to such orders.

The District has wholly misstated the law of consent decrees. Even more disturbing, these are the very issues that have already been raised by the District and decided to the contrary by this court. In upholding the recent contempt order, this court found that the District *could* comply with the population lid, that it *must* comply with the population lid and that its constitutional arguments were beside the point where the District had voluntarily avoided eighth amendment litigation by signing the consent decree. *Twelve John Does I,* 855 F.2d at 878 n. 30. The "necessity" of closing the prison system, as discussed above, is merely a posture to once again avoid compliance.

### E. Certification Requirement

The District also challenges the district court's certification requirement as beyond the powers of the court. The order required that, before Central inmates could be transferred to another D.C. facility, the Director of the Department of Corrections was to certify to the court that the transfer would not threaten to violate his obligation to provide adequate care to the inmates in the facility to which the Central inmates were transferred.

Courts may not expand relief beyond the scope of a consent decree, even if the relief would further the purposes of the decree. *Firefighters Local 1784 v. Stotts,* 467 U.S. 561, 574–75, 104 S.Ct. 2576, 2585–86, 81 L.Ed.2d 483 (1984). The certification requirement imposed here would extend relief to prisoners who were not parties to the original proceedings and are not encompassed by the provisions of the Central consent decree. Thus it is not a valid means of enforcing the decree. We vacate the certification requirement and remand for the district court to consider whether it wishes to add any additional orders in its place.

Nonetheless, had the District made a compelling case for modification, it would have been appropriate for the district court to consider the implications of any modification on other D.C. facilities, as well as the general public, in order to determine what change would be most appropriate for all concerned. *See Duran II,* 760 F.2d at 759. Since the District has utterly failed to make such a showing, that issue is not yet presented.

### III. CONCLUSION

Progress in achieving the terms of the Central decree has required numerous contempt motions by plaintiffs and an appointment of a special assistant to the mayor (in lieu of a special master) to monitor compliance. The limited prison construction effected by the District appears to have been largely prodded by court action. Time after time, the District has withheld taking even preliminary steps in the creation of new prison facilities until the eve of a court hearing on the District's contumely.

This court, in upholding the recent contempt order, excoriated the District for its "apathetic" response to overcrowding in its prison system and its "intransigence" in the face of the consent decree. *Twelve John Does I,* 855 F.2d at 877, 878. The court concluded: "We share ... the District Court's sentiment, albeit obliquely expressed, that the limits of judicial tolerance have been reached." *Id.* at 878.

The sorry record of dereliction amassed by the District, its lack of creativity in fashioning ways to reduce overcrowding and its relentless recalcitrance suggest that the district court would be justified in reassessing what sanctions will finally guarantee the District's compliance.

The order of the district court denying appellant's motion to modify the consent decree is affirmed. The orders of the district court enjoining the District of Columbia from transferring any further inmates to the Lorton Central Facility until the population of Central is in compliance with the consent decree and enjoining the District to reduce the population of Central is in compliance with the consent decree and enjoining the District to reduce the population at Central by 150 inmates every 30 days until the population returns to the levels required by the consent decree are affirmed.

The certification order is vacated.

The cause is forthwith remanded to the district court for further proceedings consistent with this opinion.

*It is so ordered.*