Herbert **BADGLEY**, James Barnes, Mitchell Chapman, Robert Gunsberg, (a/k/a Robert Alvino), Maurice McCorkle, Frank Ricchiuti, Oscar Rodriguez and Henry Smith, inmates of the Nassau County Correctional Center and Eugene Chapman, Lee McCorkle and Katherine Ricchiuti, members of inmates' families, individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Joseph J. **SANTACROCE**, Sheriff of Nassau County, Walter J. Flood, Warden of Nassau County Correctional Center, individually and in their official capacities; and the County of Nassau, Defendants.

No. CV 80–2916.

United States District Court,
E.D. New York.

June 5, 1987.

Matthew Muraskin, Legal Aid Soc. of Nassau County, Mineola (Morton J. Marshack, of counsel), for plaintiffs.

James M. Catterson, Jr., Port Jefferson, Snitow & Pauley, Walter J. Flood and County of Nassau, New York City (William H. Pauley, III, of counsel), Edward T. O'Brien, Mineola, N.Y., for defendants.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, District Judge.

Defendants move to modify the Amended Consent Decree ("Decree") filed on October 9, 1984 by increasing the authorized maximum in-house population of the core facility at the Nassau County Correctional Center ("NCCC") from 710 to 750. A mess hall in the building in which the core facility of the "NCCC" is located has been converted into a dormitory housing 40 inmates. Plaintiffs oppose defendants' application, arguing that the space should be used to house inmates who would otherwise be assigned to cells in the core facility, in order to eliminate or at least minimize alleged violations of the Decree in the use of cots and mattresses placed on the floor, double-celling beyond the established time limitations, double-celling in prohibited areas, and the failure to comply with special housing provisions. Plaintiffs also suggest that increasing the population cap would significantly reduce essential services. Plaintiffs move to enforce compliance with various provisions of the Decree "on pain of contempt and the imposition of civil penalties." [1]

THE DECREE

The Decree amended a consent judgment dated July 13, 1981. We summarize or quote the pertinent provisions of the Decree as follows:

*Maximum Capacity*

(3) ... [T]he maximum capacity of NCCC ... is as follows:

Existing cells ................. 622
Certified conference rooms........ 8
Newly constructed dormitory
  housing ...................... 157
Additional capacity acquired by
  double-celling as set forth
  herein ...................... 205
  TOTAL .... 992[2]

---

[1] In their Notice of Motion, plaintiffs allege that violations of the Decree have occurred in the following areas: failure to supply construction plans and progress reports to plaintiffs, double-celling in unauthorized areas and in excess of durational limitations, use of cots and mattresses on the floor, failure to provide protective custody to inmates in single cells whenever necessary, reduced visiting hours, inadequate recreation time and facilities, and limited availability of Law Library hours.

[2] Paragraphs 5, 6, 7, 12, 13, and 15 defining time limitations on double-celling and use of cots provide as follows:

(5) Plaintiffs and County defendants hereby agree to the double-celling of detainees and sentenced prisoners subject to the terms and conditions set forth herein. It is understood that double-celling will be avoided whenever possible. To this end, Nassau County intends that the construction projects referred to in paragraph (2) above will minimize and eventually eliminate the conditions complained of. All plans which become public documents

(4) ... [T]he actual maximum in-house population of NCCC shall not exceed 710 * plus the number of inmates actually housed in the dormitories. (Par. 4).

* This figure represents 85% of the bedspace, including second bunks, and conference rooms and other special housing units, in the existing core facility at NCCC excluding the newly constructed dormitories. It shall be reduced to 640 upon the removal of second bunks pursuant to paragraphs 5 and 14 herein.

The "actual maximum" population limit set forth in paragraph 4 was subject to increase under paragraph 32, which provided:

will be made available to counsel for the plaintiffs. If construction of the new women's wing has not commenced within three (3) years from the date of this Consent Decree or if the new women's wing is not completed within five (5) years from the date of this Consent Decree or if the County defendants have not undertaken to convert the existing women's section in the core facility (pursuant to paragraph 14 herein) within five (5) years from the date of this Consent Decree, then either party shall have the right to apply to the Court on notice to determine whether continued double-celling on the E, F, G and H floors as specified herein meets constitutional standards.

| Physical Layout of Double Cells | Prior | Added |
|---|---|---|
| E, F, G, H Floors—Added a second bed on each of the first five cells on each tier on each floor (16 tiers × 5 beds—total 80) | | 80 |
| C & D Floors—Added second beds, as above (8 tiers × 5 beds—total 40) | | 40 |
| B Floor | | |
| B1 and B2—Kept existing configuration (B1 front—14, B1 rear—4, B2—20) | 38 | |
| B3 and B4—Added a second bed in each of the first 5 cells on the long side, closest to lock box area, and a second bed in each of the first two cells on the short side (again closest to the lock box area) | | 14 |
| A Floor | | |
| A1 & A2—Kept existing configuration (all cells double-celled) | 27 | |
| A3 & A4—Added a second bed to each of the first three cells on each tier | | 6 |
| Total prior double-celling | 65 | |
| Total additional beds constructed | | 140 |
| Total number of cells equipped for double-celling | | 205 |

Defendants may accept persons charged with Class A or B felonies under the Penal Law of the State of New York and other persons charged with serious crimes who are remanded to their custody without bail or bail equal to or exceeding the sum of $100,000 without regard to the in-house population cap.

The Decree limited the use of cots (par. 15), and designating the manner of housing inmates in "protective custody" (par. 18), the manner of providing services, i.e., contact visits (par. 19), recreation (par. 21), law reference library (par. 22), recreational library and programs (par. 23), and report-

*Conditions of Double–Celling*
(6) No detainee shall be double-celled in excess of 30 days during any continuous period of incarceration (defined so as to include transfers to and from other confinement within NCCC or the Nassau County Medical Center).
(7) No inmate shall be double-celled in excess of 45 days during any continuous period of incarceration (defined so as to include transfers to and from other confinement within NCCC or the Nassau County Medical Center). Inmates who return to NCCC after spending 60 days in the Work Release Facility, the Nassau County Medical Center or other correctional facilities may be confined up to a maximum of 30 days in a double cell.
(12) Under normal operating conditions, unless otherwise requested, no double-celled inmate shall be locked in other than at night during sleeping periods, and all double-celled cells shall remain open during the day and evening hours and every inmate shall have access to the exercise area. All double-celled inmates, with the exception of those on E, F, G and H floors, shall have access to a dayroom seven days each week.

Construction contracts are being let for the air conditioning work and new windows which will permit the use of all existing dayrooms. The County defendants shall make best efforts to assure that this work is completed at the earliest possible time. It is expected that this project will be completed within one year.
(13) Subject to the limitations imposed by required classification, County defendants shall double-cell first in those cells equipped for double-celling located in tiers which have dayrooms.
(15) Except for valid medical purposes the use of cots on all tiers shall be discontinued.

ing the progress of construction projects and statistics on inmate population to plaintiffs' counsel (par. 28).[3]

The Decree further provided:

This Court shall retain jurisdiction over the provisions of this Consent Decree and any questions concerning its implementation or interpretation will be referred to the Court for resolution. (par. 30).

The court held an evidentiary hearing. The court makes the following findings of fact:

*The Core Facility*

The core facility consists of a four-story free standing building, together with structures housing various services for the core facility.[4] The north portion of the building (built circa 1965) was added to the existing south portion of the building (built circa 1955) so that the outer walls and floors were integrated with the existing floors of the south portion of the building. Inside the building, an officers' corridor is located adjacent to the outer wall of the building. Next to the officers' corridor is the inmates' corridor which borders the cells. Cell blocks are built in the center of the building and extend in a rectangular shape, conforming to the outer walls. The arrangement of cell blocks on each floor is as follows:

*North Side of the Building*

Each floor has 4 cell blocks of 20 cells each. Five of the 20 cells are equipped for double bunking. Additionally, each floor has 4 segregation cells.

---

3. Paragraphs 19, 21, 22, 23 and 28 of the Decree provide as follows:

(19) The policy of NCCC is and shall continue to be to afford at least three one hour visits each week to each inmate where practicable. A program of Saturday visitation shall be planned immediately and shall be implemented when necessary to afford at least three one hour visits each week to each inmate. When three one hour visits can be afforded during any week, the County defendants need not conduct Saturday visitation that week. The Saturday visitation program may be terminated by the County defendants on notice to plaintiffs' counsel when visitation can be accommodated during the week.

(21) Recreational services shall be provided in accordance with the regulations set forth by the New York State Commission of Correction and the recreation program shall be expanded to meet the needs of the increased population level. All newly constructed housing units shall have their own outdoor recreation areas. Women's outdoor recreation shall not be held in the "covered" area adjacent to the present women's housing area. This area shall be renovated and made suitable for women's indoor recreation pending completion of the new women's wing. It is expected that this project will be completed by the winter of 1984. Pending completion of the multiple purpose building, when inclement weather does not permit outdoor recreation, maximum use shall be made of the indoor facilities during all lock-out hours. Best efforts shall be made to minimize conflict between schedules for recreation and other programs. Current recreation schedules shall be supplied to plaintiffs' counsel.

(22) Within sixty (60) days after the execution of this Agreement the hours of operation of the Inmates' Law Reference Library shall be expanded by 28 hours per week in accordance with the proposed schedule dated May 14, 1984 attached hereto, or a comparable schedule devised by the County defendants, a copy of which shall be provided to plaintiffs' counsel. Law library facilities shall be included in the newly constructed housing units. Records shall be maintained of all those who request access each day, both in the law library(s) and on each tier's Inmate Daily Activity Request Form. Additional records shall be maintained in the law library(s) of all those who are given access to the law library(s), their period of actual attendance and whether they requested recall in the event the period of actual attendance was less than two hours.

(23) Nassau County shall repair and open the Inmates' Recreational Library and shall institute a recreational library program. At such time as the recreational library is reopened, current schedules of its hours of operation shall be supplied to plaintiffs' counsel.

Program space shall be made available in the newly constructed housing units and best efforts shall be made to maintain the Work Release Program.

(28) The County defendants shall file quarterly reports with the County Executive and the County Attorney with copies to counsel for the plaintiffs briefly summarizing the progress of the construction projects referred to hereinabove. The County defendants shall make available to the County Attorney and plaintiffs' counsel inmate population statistics once every week and the "Badgley printout" once every two weeks for a period of five (5) years.

4. An administration building was added at the west wall of the facility.

*South Side of the Building*

The first floor has 4 cell blocks of 12 cells each. They are described as tiers A1, A2, A3 and A4.

The second floor has 4 cell blocks of 12 cells each. They are described as tiers B1, B2, B3 and B4.

The rest of the building consists of 8 cell blocks on two levels: 4 tiers on one level described as C1, C2, C3 and C4; and 4 tiers on the upper level described as D1, D2, D3 and D4. In addition, each level has 2 segregation cells.

Three areas formerly used as recreational areas within the building (described in the Decree as "Newly constructed dormitory housing") were converted to dormitory areas housing 157 inmates.

*The Newly Created Dormitory*

Originally, an area of about 3,000 square feet of space on the first floor in the south side of the building was used as a kitchen to prepare food for inmates. Some time prior to 1984 the NCCC turned to prepared portions of food to be delivered in heated carts to inmates at their cells. Until August 1986, the space was used only occasionally to service inmates that returned to the NCCC from court appearances after the dinner hour. In October 1984, application was made to the New York State Commission of Correction to convert the space to a dormitory to accommodate 40 inmates.[5] By letter dated December 18, 1985, the New York State Commission of Correction approved the proposal "to establish a new 40–bed dormitory unit in exist-

ing Mess Hall space at the Nassau County Correctional Center." The conversion of the space to a 40–bed dormitory was completed in time for use in August, 1986.

The dormitory space consists of 10 units of 4 beds bolted to the floor and aligned together against a headboard panel with lockers in between. Each bed is allotted 60 square feet of space. Approximately 600 square feet are used for toilet facilities and showers; an area is also designated as a place for observation into the dormitory by a correction officer.

*The Inmate Population*

For the period from April 28 through September 4, 1986[6] the inmate population on the following dates was as follows:

| Date | Core | Dormitories | Total |
|------|------|-------------|-------|
| April 28, 1986 | 775 | 183 | 958 |
| June 2, 1986 | 789 | 182 | 971 |
| July 1, 1986 | 790 | 182 | 972 |
| July 15, 1986 | 750 | 182 | 932 |
| August 4, 1986 | 784 | 184 | 968 |
| September 4, 1986 | 766 | 222 | 988 |

On February 26, 1987,[7] this court granted defendants' application to increase the maximum authorized in-house population by allowing 740 inmates,[8] pending determination of the application on the merits. The Court of Appeals interpreted the intermediate order as a preliminary injunction, vacated the order and remanded to this court for fact findings under Rule 52(a), Fed.R.Civ.P. *Badgley v. Santacroce*, 815 F.2d 888, 889, (2d Cir.1987). The order of February 26, 1987 was reinstated by order of this court dated May 1, 1987 upon fact findings stated in the memorandum of deci-

---

5. In a memorandum of decision dated March 26, 1984, the court denied defendants' application to use the space to house inmates. The court said:

> The further application to increase the maximum based on the anticipated increase of living areas in the mess hall is denied without prejudice. The elimination of the mess hall may interfere with the delivery of meals to the inmates in the old building. Further, the plans have not yet been put into operation. If the conversion is completed the court will consider a further application based on the experience in eliminating the use of the mess hall.

> *Badgley v. Varelas*, CV 80–2916, Memorandum of Decision at 11–12 (E.D.N.Y. March 26, 1984) (unpublished decision).

6. On August 25, 1986, the Court of Appeals reversed the order of this court denying plaintiffs' motion to punish the Sheriff and Warden for a contempt of court in transporting and accepting new inmates above the cap of 710, *Badgley v. Santacroce*, 800 F.2d 33, 39 (2d Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

7. *Badgley v. Santacroce*, CV 80–2916, Memorandum of Decision and Order at 5 (E.D.N.Y. Feb. 26, 1987) (unpublished decision).

8. This number was apart from the A and B Felons referred to in paragraph 32 of the Decree.

sion. *Badgley v. Santacroce*, CV–80–2916, Memorandum of Decision and Order (E.D. N.Y. May 1, 1987) (Unpublished decision). On June 1, 1987, this court amended its order of May 1, 1987 to increase the authorized maximum in-house population to 750 pending determination of the motion on the merits.

During the period from March 1, 1987 to April 15, 1987 the inmates at the core facility housed in cells ranged from 699 (March 2) to 700 (March 30 and April 4). Of this number about 40% of the inmates were held on charges of A and B felonies or parole violation.[9] The dormitory population (excluding the subject dormitory) remained fairly constant at 157.[10]

### New Construction

A 300–bed modular facility, adjacent to the core facility, is nearing completion and is expected to be available for use by August 1987. Defendants intend to use the facility for sentenced misdemeanants. It will have its own food service, visiting area, and indoor and outdoor recreation areas. It will in no way burden the services of the core facility.

### Proposed Construction

Plans for a new multi-purpose indoor recreation building have been approved and advertised for bids. Preliminary plans also exist for a 160–bed facility to house female inmates with provision for use of part of the facility for male inmates.[11]

### Core Facility Services

Our inquiry is directed at analyzing what effect, if any, the presence of 40 additional inmates has on the services available to the inmates of the core facility.

### Food Service

Since the inmates of the core facility are on a portion control method of food service, where food is delivered directly to the inmates on a hot cart, the presence of additional inmates within the core facility in no way adversely affects the food service.

### Visits

Visiting hours are from 12:30 p.m. to 3:30 p.m. and from 5:00 p.m. to 9:00 p.m. from Monday to Friday. Each inmate is permitted three one-hour visits each week. Based on an inmate population of 907 (710 in the core facility plus 157 in the pre-existing dormitories and 40 in the new subject dormitory) the total number of hourly visits each week is 2,721 (the product of 3 hourly visits for 907 inmates). The total number of visiting hours available per week is 2,800 (the product of seven visiting hours per day for eighty (80) inmates each hour, for five days each week).

The visiting area has 160 chairs at open tables. It can accommodate 80 inmates and 80 visitors. At times (usually Monday and Friday evenings) it cannot accommodate all the inmates asking for visitors or all the visitors. At other times, such as during afternoon hours and some evenings, the visiting area is not fully utilized. The problem is not related to adequacy of space or staff, but rather, the difficult task of scheduling. When the demand does not tax the capacity of the visiting area, inmates are permitted visits beyond the allotted time; on the other hand, when the demand is greater than the available space, visiting time may be reduced. Many inmates actually refuse to see visitors at all.

The addition of 40 inmates does not adversely affect the visiting rights of any

---

9. For example, on March 2, there were 274 inmates held on charges of "A & B Felonies" and 25 "parole violators"; on March 30, there were 285 inmates held for "A & B Felonies" and 38 "parole violators"; on April 4, there were 282 "A & B Felonies" and 46 "parole violators."

10. The population in the subject dormitory remained fairly constant at 40. The needs of the facility and regulations of the Commission of Correction which require fixed numbers of beds for juveniles, pre-trial detainees, mentally dis-

turbed inmates and other special housing requirements stand in the way of fuller utilization of bed space. For example, on March 3, 1987 when the core population was 709 (which included 40 inmates in the subject dormitory), the warden used 13 cots when there were 160 unoccupied beds in the facility.

11. Under paragraph 5 of the Decree "construction of the new women's wing" must start before October 9, 1987.

inmate in the core facility or dormitories to any significant degree.

### Indoor Recreation Area

The indoor recreation area is 33 feet by 72 feet. It is used only when inclement weather denies inmates the use of the outdoor recreation area. Each floor of the core facility may use the indoor recreation area three times a week. Fewer than 50% of the inmates actually utilize the indoor recreational facilities.[12] Nevertheless, the recreation area is inadequate at the present time. The transfer of inmates from the core facility to the newly erected 300–bed modular facility is expected to afford inmates a better opportunity to use the indoor recreation area. The addition of 40 dormitory inmates in the newly converted mess hall has only a minimal adverse effect on the use of the indoor recreation area.[13]

### Law Library

The law library is seldom used by inmates to its full capacity. Many inmates decline when the opportunity to use the library is offered to them. More often it is a refuge for inmates who seek to escape the boredom of the cell. The use of the law library is a function of scheduling rather than adequacy of space or facilities. Inmates are afforded the time they reasonably require for research.

### Double Bunking

Double bunking is authorized by the Decree for designated units in specified numbers and for limited periods of time.[14] The Decree provides for double bunking of inmates in 140 cells in addition to the 65 double-bunking cells in existence at the time of the Decree. Thus, a total of 205 cells may be equipped for double bunking. Of this number, 98 cells are located in special housing units[15] and 112 cells are located in general population units.[16] The special housing units contain 246 cells and the general population units contain 383 of the "existing cells" referred to in the Decree. The total housing capacity in the general population units is 500; the total capacity for all special housing units is 332.

The Mental Observation units (C2, D1 and D2) contain 57 cells with a capacity for 72 inmates. The Medical Observation unit (A3) has 11 cells with a capacity for 14 inmates. The B floor Medical Clinic has 12 cells with a capacity for 17 inmates. The Mental Observation units and Medical Observation unit are normally utilized to their full capacity.

The Decree limits double bunking to 30 days for pre-trial detainees, and 45 days for sentenced inmates, during any period of continuous incarceration. (par. 6, 7). Some double bunking in excess of the limits authorized by the Decree is evident from computer data offered at the hearing. The statistical data supplied by the defendants and offered into evidence by the plaintiffs is not an accurate reflection of the existence of double bunking due to the method of gathering and recording the computer data; it is therefore, unreliable. At times, double bunking is provided at the request of inmates and at other times it is recommended for inmates who are suicidal or in need of psychiatric supervision on the mental observation units.

### Use of Cots

The use of cots "for valid medical purposes" is authorized under the Decree. (par. 15). The Decree requires discontinuance of the use of cots on all other tiers. In the medical and mental observation tiers cots are used at times when space in the cells in not available.[17]

---

12. Many inmates choose not to participate in indoor recreational activities.

13. Casual indoor recreation is also available to inmates in the day rooms of the core facility and dormitories. The newly constructed dormitory has its own day room.

14. See n. 2, *supra.*

15. Special Housing Units include Mental Observation, Medical Observation, Protective Custody, Segregation, Administrative Segregation and Reception areas.

16. The difference between the authorized number (205) and the number of cells equipped for double-bunking (210) (See Ex. 9) is not entirely clear.

17. At times there are no cots on a particular mental observation tier, at other times there may be as few as 1 or as many as 6 cots on the

The typical use of cots occurs on the mental or medical observation units or in the B-floor medical clinic when the number of inmates in need of examination or care for emotional, psychiatric or medical complaints exceeds the number of beds available. In these situations, the need for cots is apparent.[18] The warden has succeeded in eliminating the use of mattresses on the floor.

Tabulations of data regarding the use of cots, as offered by plaintiffs,[19] shows cots in use on other units in addition to the medical and mental observation tiers. These tabulations are extrapolated from the same computerized statistical data that we found unreliable, as noted above. Therefore, it is not clear that cots are routinely being used in non-medical areas.[20]

## DISCUSSION

We view the defendants' motion to modify the Decree "by increasing the maximum in-house population of the core facility ... from 710 to 750" as an application for permission to use the converted mess hall space as an additional dormitory to house 40 inmates at the core facility i.e., an application to expand the number of dormitory beds in a newly renovated area. For the purposes of the parties to the litigation, the inquiry focuses on essentially the same issue:

Does the presence of 40 additional inmates in the core facility significantly reduce or adversely affect the auxiliary services to the inmates at the core facility?

We turn first to the power of the court to modify a consent decree and the essence of such a decree. A consent decree is a judicial act and is not to be treated simply as a contract. *United States v. Swift & Co.*, 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). *See Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1119–20 (3rd Cir.1979) *cert. denied* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). ("[W]hile consent decrees are judicial acts, they have often been recognized as having many of the attributes of a contract voluntarily undertaken"). The court, as a court of equity has the power "to modify an injunction in adaptation to changed conditions, though it was entered by consent.... A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need (citations omitted)." *United States v. Swift & Co.*, *supra*, 286 U.S. at 114, 52 S.Ct. at 462. *See New York State Association for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 970 (2d Cir.) *cert. denied* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). ("As experience with this type of litigation increases, a consensus is emerging among commentators in favor of modification with a freer hand.") *See also Badgley v. Santacroce*, 800 F.2d 33, 38 n. 3 (2d Cir.1986), *cert. denied* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987) (noting that Supreme Court recently held consent judgments enable federal court to adopt broader remedial measures). The power of the court to modify a consent decree does not mean that the court is vested with the authority

tier. (Testimony of Inmate Dawn Harris, Tr. at 297).

**18.** A typical example of this is the inmate population count of January 28, 1987 (Ex. 8—last entry). The capacity in the D1 and D2 Mental Observation Units is 24 per unit. On that date, the D1 unit housed 30 inmates (6 cots) and D2 housed 32 inmates (8 cots).

**19.** See Plaintiffs' Memorandum of Tabulations from Data in Evidence at the Hearing, Table II.

**20.** Defendants deny this use of cots in non-medical areas claiming that the computer records contain "reporting anomalies" that reflect certain planned internal moves of inmates before they actually occur and before inmates being

released or transferred are purged from the computer. This, they contend, leads to the erroneous appearance of additional occupants (and hence, the assumption that cots are in use) on a unit, which is not occurring in reality. Defendants also maintain that contrary to plaintiffs' allegation, cots are not in use in Dormitory B. Rather, metal beds, similar to the beds used by the other inmates, are utilized to house additional inmates in that dormitory. When this occurs due to inmate classification regulations of the Commission of Correction, there are vacant beds in the other dormitories so that the cap of 157 inmates is maintained in the dormitory areas.

to fashion its own decree and disregard the intention of the parties. The power of the court may be used only to help attain the goal intended by the decree. *New York State Association of Retarded Children, Inc. v. Carey, supra,* 706 F.2d at 969.

■ The court is invested with considerable discretion in deciding whether to modify a consent decree, particularly where the court is dealing with a case that involves continuously changing conditions, *see United States v. Swift & Co., supra,* 286 U.S. at 114, 52 S.Ct. at 462; *Ruiz v. Lynaugh,* 811 F.2d 856, 860 (5th Cir.1987); *Duran v. Elrod,* 760 F.2d 756, 758 (7th Cir.1985), or is intimately involved in a case that concerns institutional reform. *See Ruiz v. Lynaugh, supra* at 861. That discretion is guided by the legal principle that modification of a consent decree requires "that a significant change of circumstances shall have occurred ... to warrant modification." *Id.* at 860. (citing *Duran v. Elrod,* 713 F.2d 292, 296 (7th Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 143 (1984); *Benjamin v. Malcolm,* 528 F.Supp. 925, 928 (S.D.N.Y.1981). A more flexible approach to modification of a consent decree has been followed in many cases involving institutional reform. *See Ruiz v. Lynaugh, supra,* 811 F.2d at 861, (citing, *inter alia, Newman v. Graddick,* 740 F.2d 1513, 1520–21 (11th Cir.1984); *New York State Association for Retarded Children Inc. v. Carey, supra,* 706 F.2d at 970;[21] *United States v. City of Chicago,* 663 F.2d 1354, 1359–60 (7th Cir.1981); *Benjamin v. Malcolm,* 564 F.Supp. 668, 686 (S.D.N.Y.1983).)

In *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), the Supreme Court stated:

[T]he *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

### The Amended Consent Decree

The provisions for double bunking in the Decree in the instant case are instructive in construing the intentions and purposes of the parties. The Decree expressly provided for double bunking. It expressed the expectation that the planned construction would "minimize and eventually eliminate the conditions complained of" (par. 5). It did not mandate elimination of double bunking if construction plans were delayed or not pursued. It provided only that if the women's wing were not started within three years or completed within five years, plaintiffs or defendants could apply to court "to determine whether continued double-celling in E, F, G and H floors ... meets constitutional standards." (par. 5) The Decree expressed the goal of eliminating double bunking from the E, F, G and H floors with the completion of the new women's wing and the transfer of male inmates to those floors to be occupied in single cell arrangements. (par. 14).

A major objective of the Decree was to reduce double bunking at the core facility and eliminate double bunking on the E, F, G and H floors in accordance with a plan for expanding bed space over a period of five years. The Decree contemplated de-

---

**21.** In *Carey,* the court (J. Friendly), stated, "in institutional reform litigation ... judicially-imposed remedies must be open to adaptation when unforeseen obstacles present themselves, to improvement when a better understanding of the problem emerges, and to accommodation of a wider constellation of interests than is represented in the adversarial setting of the courtroom." 706 F.2d at 969.

fendants' problems and expansion plans and the time required. The Decree did not limit the right of the defendants to expand the bed space in the core facility, or to renovate existing areas for a different use.

■ We find that the conversion of the mess hall into dormitory space to be occupied by 40 inmates does not contravene the purposes and goals of the parties to the Decree. This conversion represents a changed condition sufficient to warrant modification of the Decree. After careful consideration, we conclude that the addition of 40 inmates within the core facility does not tax the auxiliary services available to the inmates to any significant degree.

*Provision of Services at the NCCC*

Plaintiffs' complaints of curtailed visiting hours, deprivation of the indoor recreation area, and difficulty in gaining access to the law library are largely a matter of scheduling rather than inadequacy of space or facilities. In *Bell v. Wolfish*, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979), the Court noted:

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. (citations omitted). 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and ... courts should ordinarily defer to their expert judgment in such matters.' *Pell v. Procunier*, 417 U.S. at 827, 94 S.Ct. at 2806 [41 L.Ed.2d 495 (1974)].

In considering plaintiffs' allegations concerning the availability of auxiliary services and housing conditions, we find that defendants have established the following:

*Food Service*—The presence of 40 additional inmates does not adversely affect the food service in the core facility since an individual portion control method is used.

*Contact Visits*—Inmates were afforded "at least three one-hour visits each week to each inmate where practicable" (Decree, par. 19).

*Recreation*—The indoor recreation area is inadequate. For the present (and until inclement winter weather sets in) the need for a larger indoor recreation area has lessened. With the completion of the 300–bed modular facility anticipated in the near future and the transfer of women inmates to the new facility, the present indoor recreation area will adequately serve the remaining inmates (See Decree par. 21).

*Law Reference Library*—The library meets the needs of all the inmates of the core facility including the 40 additional inmates in the converted mess hall (Decree par. 22).

*Reporting Requirements*—Plaintiffs have been fully advised of planned construction. Any failure to accurately report under the "Badgley print out" provision of the Decree is attributable to computer errors. (Decree par. 28). Defendants are expected to make every reasonable effort to restore the system so that plaintiffs receive reliable information concerning double bunking and cot counts.

*Double–Bunking—Durational Limits*—Plaintiffs have failed to establish that double bunking continues beyond the durational limitations set forth in the Decree in situations other than voluntary inmate requests or medical/psychiatric indication. This failure may be due in part to the unreliable data supplied by defendants. Therefore, defendants are to supply plaintiffs with accurate information on the use and duration of double bunking as provided in the Decree. Failure to do so will result in a shifting of the burden of production from plaintiffs to defendants in any future claim by plaintiffs regarding double bunking.

*Cots*—Similarly, plaintiffs have failed to establish clearly that cots are in use on units that are not authorized in the Decree. The use of cots in A3, B medical clinic, C2, D1, and D2 tiers, the medical and mental observation units, is authorized under paragraph 15 of the Decree. The use of cots is

prohibited in other areas. Since the same unreliable data formed the basis for plaintiffs' allegation regarding cots in other units, as the data used for allegations of double-bunking, the same admonition and direction applies here. Again, defendants are to provide plaintiffs with accurate information regarding use of cots in any area other than the A3, B medical clinic, C2, D1 and D2 medical and mental observation units. Failure to do so will result in a shifting of the burden of production from plaintiffs to defendants in any future claim by plaintiffs regarding unauthorized use of cots.

*Considerations in Modifying a Consent Decree*

In fashioning a remedial procedure to carry out the intention of the parties we are aware of the standard in *United States v. Swift & Co., supra,* 286 U.S. at 119, 52 S.Ct. at 464, i.e., whether the defendants established "a clear showing of grievous wrong evoked by new and unforeseen conditions." The court should consider "not only the burden of the modification on the plaintiffs, and the benefits of the modification to the county governments, but also the benefits and burdens to the public." *Duran v. Elrod, supra,* 760 F.2d at 759. (Double bunking prohibition in consent decree was suspended for a few weeks until the jail was enlarged where the increasing crime rate in Cook County made it impossible to comply with the "cap" order and the public interest would be affected by any accelerated release of inmates. *Id.* at 757, 760–61.)

In *Dean v. Coughlin,* 804 F.2d 207, 213 (2d Cir.1986) the court said:

We have repeatedly been cautioned (1) not to use a sledgehammer where a more delicate instrument will suffice, (2) not to move too quickly where it appears that the state, in the exercise of its administrative authority, will in its own way adopt reforms bringing its system into compliance with the Constitution, and (3)

to give the state a reasonable opportunity to remedy a constitutional deficiency, imposing upon it a court-devised solution only if the state plan proves to be unfeasible or inadequate for the purpose (citations omitted).

The court in *Dean* quoted the Supreme Court in *Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837–38, 36 L.Ed.2d 439 (1973):

It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations and procedures, than the administration of its prisons.... Since these internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems.... The strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors thus also requires giving the States the first opportunity to correct the errors made in the internal administration of their prisons.

804 F.2d at 214.

We take special note at this time of the extraordinary effort by the state courts to comply with the limitations imposed by the Decree as interpreted by the Second Circuit Court of Appeals. These efforts have included monitoring of the condition of the population census in the NCCC by the judges of the state court and the various means they have undertaken and proposed to avoid exceeding the cap.[22]

In closing, it is appropriate to quote the insightful words of the Supreme Court in *Procunier v. Martinez,* repeated in *Bell v. Wolfish, supra,* 441 U.S. at 549, 99 S.Ct. at 1879 n. 30, which again bear repeating here:

Suffice it to say that the problems of prisons in America are complex and intractable, and more to the point, they are

---

**22.** These measures include overnight detention at court, special bail arrangements, the suggestion by the Administrative Judge to remove juvenile inmates to rehabilitation facilities, and

the recommendation by the District Attorney for an "electronic bracelet-home detention" system.

not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.

*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974).

## CONCLUSION

Defendants have the right to enlarge the bed space at the NCCC and use it to house 40 inmates in a newly constructed dormitory, while maintaining the 'cap' of 710 in the core facility (excluding said 40 inmates).

The auxiliary services are not adversely affected by the addition of 40 inmates housed in the dormitory.

Defendants have demonstrated their good faith in attempting to comply with the conditions of the Decree.[23]

The 300–bed modular facility which is nearing completion and the plans for future expansion of the facility are designed to eliminate the use of cots, and to eliminate or reduce the incidence of double-bunking.

## ORDER

Defendants are authorized to use the converted mess hall as a dormitory for 40 additional inmates.[24]

Plaintiffs' motion to establish deadlines "for compliance on pain of contempt and the imposition of civil penalties"[25] is in all respects denied.

The use of cots except in tiers A3, B medical clinic, C2, D1 and D2 shall cease.

Defendants shall supply plaintiffs with accurate and reliable statistics concerning the use of double bunking and the use of cots at the general and special population tiers (other than A3, B medical clinic, C2, D1 and D2 tiers). If the plaintiffs hereafter claim a violation of the Decree in the use of double bunking and/or use of cots in tiers of general population and further if the court finds that the information supplied by defendants concerning these claimed violations is inaccurate and unreliable, then the initial burden of proof shall be on the defendants to show compliance.

SO ORDERED.

---

**23.** To alleviate the overcrowding in the jail, the defendants have undertaken the construction of a new 300–bed modular facility (instead of a 100–bed facility which would have satisfied the consent decree requirement (par. 2)), renovated the annex facility to increase the capacity to house more inmates, renovated the mess hall to accommodate inmates, continue to board a significant number of inmates in upstate facilities, are seeking a new bond ordinance to fund another 100–200 bed maximum security women's facility, have reached the bidding phase for construction of a new multi-purpose recreation building and medical unit, and have implemented the individual portion control system of food service.

**24.** We view this as an increase in the number of dormitory beds from 157 to 197 rather than as an increase in the cap of the core facility from 710 to 750.

**25.** This language is borrowed from *Badgley v. Varelas*, 729 F.2d 894, 903 (2d Cir.1984).